PAM R., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–12742.

Supreme Court of Alaska.

May 23, 2008.

Christi A. Pavia, Pavia Law Office LLC, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Anita L. Alves, Assistant Public Advocate and Joshua P. Fink, Public Advocate, Anchorage, for Guardian ad Litem.

Before: FABE, Chief Justice,
EASTAUGH, CARPENETI, and
WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

A grandmother appeals from a trial court determination that she is not the "Indian custodian" of her three grandchildren under the Indian Child Welfare Act. The trial court found that contrary to her urgings, the grandmother was not an Indian custodian by tribal custom or by transfer of physical custody of the children; she argues that the court's findings are erroneous. There is sufficient evidence in the record to support the trial court's findings, and we therefore affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts[1]

Mark and Sally have three sons, Max (born in 2002), George (born in 2004), and Edward (born in 2006). Mark has some Alaska Native heritage, and Sally is an enrolled member of the Native Village of Kotzebue. Pam R., the children's maternal grandmother, is an Alaska Native. Each of the three children is an "Indian child"[2] with-

in the meaning of the Indian Child Welfare Act of 1978[3] (ICWA).

From the time of Max's birth until mid-May 2005, Mark, Sally, and the children generally led "somewhat of a chaotic and nomadic lifestyle," residing with a variety of relatives and friends. The trial court observed that "[i]t is really impossible to determine accurately where the parents and children have resided since 2002."

In early May 2005 Mark was incarcerated for assaulting Sally; Sally briefly "disappeared," leaving Max and George with Pam. Pam sought help from Mark's parents, the Olivers. The Olivers took Max and George to their home and indicated to OCS that they wanted the children to remain with them. But at that time, the OCS social worker believed there was not a sufficient basis to justify removing the children from Sally's custody and recommended that they be returned to her.

Later in May 2005 an OCS social worker met with Sally and Pam and devised a "care and safety plan" to allow Max and George to remain with Sally in Pam's home. The plan specifically provided that Pam would "be responsible to care for [the] children and [would] not allow any unsupervised contact between [Sally and the] children" and that Pam was not to allow Sally contact with the children if Sally were under the influence of drugs. The trial court later found that this "care and safety plan did not grant [Pam] custody over the children, but made her [Sally's] and the children's supervisor."

Mark was released from jail in June 2005 and regularly saw the children despite a restraining order barring contact with Sally. Sally decided when the children would visit with Mark and the Olivers. Mark again was incarcerated in August 2005, and Sally also

---

1. Pseudonyms are used for all family members.

2. *See* 25 U.S.C. § 1903(4) (2000).

3. 25 U.S.C. § 1901–1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902 (2000). As this court recently observed:

The Act establishes a system for ensuring tribal participation in state procedures for placing Native children and provide[s] for tribal court jurisdiction over many child welfare proceedings. In addition, the Act creates a series of procedural safeguards that limit the circumstances under which Indian children may be removed from their family homes.
*State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. v. Native Vill. of Curyung*, 151 P.3d 388, 412 (Alaska 2006).

was incarcerated briefly at about this same time for assaulting Mark's sister. After Mark's release, he joined the children at Pam's home for about ten days.

Mark called OCS in early November 2005 to express concerns that Max and George were living in a "crack house" with Sally. An OCS social worker, accompanied by local police, went to the trailer where Mark had alleged Sally and the children were living. When no one answered the door, the social worker called Pam and asked where the children were. Pam first stated that they were with her, but when the social worker asked to visit, Pam admitted that Max was with Sally. Pam soon came to the trailer, and, observed by the social worker, brought Max out with her. When Sally came out of the trailer, she appeared to be under the influence of drugs. The OCS social worker described the trailer as "an ice block." It had an uncovered broken window, numerous boarded-up windows, exposed pipes, and only a small space heater in a back room.

OCS told Sally that she must consent to giving custody of Max and George to the Olivers or OCS would take emergency custody of them.[4] OCS did not consider whether Pam had any rights as an Indian custodian.[5] Sally agreed to place the children with the Olivers under the terms of a new care and safety plan.

In December 2005 OCS filed a petition to adjudicate Max and George children in need of aid based on Sally and Mark's history of substance abuse and domestic violence. The Kotzebue IRA Council/Native Village of Kotzebue (the Tribe) intervened and was granted "an equal right to notice and to participate in all proceedings in [the] case." Mark and Sally later stipulated that Max and George were children in need of aid and agreed to "work case plans with OCS" for reunification of the family.

In April 2006 OCS recommended that the children be committed to OCS's custody for up to two years, and at a disposition hearing the trial court found the "ICWA relative placement" with the Olivers to be in Max and George's best interests. The court also recognized that Pam was trying to assert rights as the children's Indian custodian and appointed an attorney to represent her.[6] Pam sought to intervene in the termination proceedings in August 2006.

On October 9, 2006, Sally gave birth to Edward at home. Sally and Edward were transported to a hospital, where Edward

**4.** AS 47.10.142 and CINA Rule 6(a) permit OCS to assume emergency custody of a child without court order, but require OCS to file a petition within twenty-four hours when it is determined that continued custody is necessary to protect the child.

**5.** ICWA recognizes and accords certain rights to an "Indian custodian," who is "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." 25 U.S.C. § 1903(6) (2000). *See* discussion *infra* note 6.

**6.** ICWA contemplates that an Indian custodian will share or assume many of the rights possessed by custodial parents in child custody proceedings. Under ICWA, rights possessed by both an Indian child's parent and Indian custodian in relation to a custody proceeding include: (1) the right to notice of an involuntary proceeding and to obtain a continuance, 25 U.S.C. § 1912(a) (2000); (2) the right to participate as a party in a state court proceeding for foster care placement or termination of parental rights, *see* 25 U.S.C. § 1911(c) (2000) (giving Indian custodian right to intervene); (3) the right to court-appointed counsel if indigent, 25 U.S.C. § 1912(b) (2000); (4) the right to avoid a child's removal from a parent or Indian custodian or the termination of a parent's parental rights unless a showing is made that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child, 25 U.S.C. § 1912(e)-(f) (2000); (5) the right to voluntarily consent to a foster care placement and the right to withdraw such consent at any time and have the child returned, 25 U.S.C. § 1913(a)-(b) (2000); (6) the right to petition a court to invalidate a foster care placement or termination of a parent's parental rights when the Indian child was removed from the parent or Indian custodian's custody in violation of certain provisions of ICWA, 25 U.S.C. § 1914 (2000); and (7) the right to have an Indian child returned when a petitioner in a state court child custody proceeding improperly removes or retains custody of the child, unless the child would be endangered, 25 U.S.C. § 1920 (2000).

If Pam were the children's Indian custodian, these provisions would have given her the right to participate as a party in the termination proceedings and perhaps the right to require that the children be returned to her.

tested positive for cocaine and was found to have several other health concerns. The next day, October 10, 2006, an OCS social worker notified the hospital staff that OCS was "assuming custody" of Edward.[7] Sally was not informed of this by OCS, but when Sally told hospital staff that Pam was going to take Edward home, she was advised that it "would be up to OCS" and that "[they would] have to have a meeting with OCS."

On October 11, 2006, a "team decision meeting" was held at the hospital to discuss Edward. Sally and Pam apparently had agreed prior to Edward's birth that Pam would take care of Edward, and at the meeting they presented a form document memorializing Sally's designation of Pam as Edward's Indian custodian.[8] An OCS social worker then informed them that Edward already had been taken into emergency custody and that a disposition hearing had been scheduled.[9]

### B. Proceedings

A hearing on Pam's status as the three children's Indian custodian was held over three days in January and February 2007. Sally and Pam advocated for Pam's designation as the children's Indian custodian; Mark objected. The guardian ad litem for the children opposed Pam's designation as Indian custodian.

It was clear that for the majority of time from May through early November 2005, Max and George lived in Pam's home, but at trial the parties characterized Pam's role in the two children's lives very differently. Sal-

ly considered Pam the children's default mother, assuming that Pam would always be there for Max and George and leaving them with Pam for indefinite periods of time. Pam agreed, testifying that she was "like a mother" to the children and that "they were always around [her]." Mark testified that Pam was more like a "babysitter." Sally also testified that she and Mark decided where the family would live and made all of the medical decisions for the boys. Mark's mother testified that "[e]verything was always up to [Sally]," and other testimony reflected that Sally was the primary decision-maker when she was present, although she was frequently "elsewhere" or "unavailable."

Mary Schaeffer, a member of both the Kotzebue tribal council and the Tribe's social services committee and a qualified expert on Kotzebue tribal customs, testified that Pam was "an Indian custodian" for the children under the Tribe's customs. She also testified that Kotzebue's Native culture "never had that kind of [family] dispute [about the designation of an Indian custodian] where it can't be resolved," but if family consensus could not be reached, a dispute likely would be resolved by the tribal court.[10]

The trial court noted that as represented by Schaeffer, the Tribe's conceptualization of an Indian custodian was "fluid" and based on observations of "who [was] taking care of their children when the parents are absent or are unavailable." The court concluded that as a matter of law "ICWA requires a narrower interpretation" than the definition Pam sought and that an Indian custodian is "not

---

**7.** *See supra* note 4.

**8.** This form document provided that Sally was "hereby transfer[ring] the care and custody of" Edward to Pam, authorized Pam to consent to medical treatment and hospital care for Edward, and expressed that the "placement is revocable [under] ICWA." Sally's signature was dated October 11, 2006, as was Pam's signature confirming her acceptance. Pam testified that she and Sally signed the document during the meeting; Sally testified she could not recall when she signed it.

**9.** OCS filed the emergency petition just prior to the meeting. The initial petition for emergency custody, filed October 11, 2006, reported that OCS had taken Edward into custody that day. In an amended petition filed on November 6,

2006, OCS indicated that custody of Edward had been taken on October 10, 2006.

**10.** Schaeffer also testified that the tribal council had passed a resolution finding that Pam was the children's Indian custodian, but it is not clear if the resolution took Mark's objection into account; the parties do not discuss the resolution in their briefs. The Tribe is not involved in this appeal, having given notice that: "The Social Services Committee has met and discussed the matter. The members of the Committee have decided they do not wish to take a position regarding the appeal of the [trial court's] decision that [Pam] was not an Indian Custodian based on the facts of the case."

just a caregiver or an addition to a parent; rather, an Indian Custodian is a person who stands in the place of a parent in a CINA proceeding." The court went on to find that Pam was not the children's Indian custodian by tribal custom because "[t]he children were not consistently or exclusively in her care, and it was the parents who maintained both legal and physical custody of the boys."

On this same basis, the trial court also found that Pam was not the children's Indian custodian through temporary physical custody. Finally, the court found that even if Pam at one time had temporary physical custody of Max and George, it was revoked when OCS assumed their legal custody and Mark and Sally agreed to OCS case plans for reunification of the family.

Pam appeals, arguing that both her physical custody of the children and tribal custom qualify her as the children's Indian custodian under ICWA and that the trial court erred in finding otherwise.

## III. STANDARD OF REVIEW

■■■ We apply the clear error standard when reviewing a trial court's factual findings,[11] reversing only where we have a definite and firm conviction that a mistake has been made.[12] When reviewing factual findings we ordinarily will not overturn a trial court's finding based on conflicting evidence,[13] and we will not reweigh evidence when the record provides clear support for the trial court's ruling;[14] it is "the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[15] Questions of law—such as the

trial court's interpretation of "Indian custodian" under ICWA—are reviewed de novo.[16]

## IV. DISCUSSION

### A. Introduction

Because no state or tribal court order had placed legal custody of the children with Pam, Pam could be the children's Indian custodian only by "tribal custom" or by parental transfer to her of the "temporary physical care, custody, and control" of the children.[17] ICWA does not define or otherwise explain "temporary physical care, custody, and control."[18] Pam asserts that neither ICWA nor state law articulates any relevant standards of exclusivity or duration of care, and OCS does not present any relevant objective criteria. Other jurisdictions have noted that a court should consider the "nature, frequency, and duration of contacts" when making a determination whether a nonparent had physical care of a child.[19] Because under ICWA a physical custodian's right to care for a child flows solely from a parent's "temporary" transfer of child-care responsibility, the custodial relationship logically may end when a parent returns and reassumes responsibility for the child's care, custody, and control.

### B. Physical Custody

#### 1. Max and George

■■■ The trial court acknowledged that Pam was "very active" and involved as a grandparent to Max and George, and that they spent a great deal of time with her both

11. *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004) (citing *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

12. *A.B.*, 7 P.3d at 950 (quoting *R.J.M. v. State, Dep't of Health & Soc. Servs.*, 973 P.2d 79, 84 (Alaska 1999)).

13. *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003) (citing *In re Friedman*, 23 P.3d 620, 625 (Alaska 2001)).

14. *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000).

15. *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) (quoting *Knutson v. Knutson*, 973 P.2d 596, 599–600 (Alaska 1999)).

16. *D.M.*, 995 P.2d at 207.

17. *See* 25 U.S.C. § 1903(6) (2000).

18. Under state law, physical custody is the "responsibility for physical care and immediate supervision of the child." *D.J. v. P.C.*, 36 P.3d 663, 670 n. 26 (Alaska 2001) (citing *Bennett v. Bennett*, 6 P.3d 724, 726 (Alaska 2000)); *cf.* AS 25.30.909(14).

19. *In re L.F.*, 121 P.3d 267, 270 (Colo.App.2005).

with and without their parents. But the court found that despite the family's "chaotic and nomadic lifestyle," the children were with the parents "most of the time," the parents made the decisions where the children would reside, and "without exception" the parents brought the children to medical appointments or for emergency treatment. The court found that the children were not consistently or exclusively in Pam's care; rather "it was the parents who maintained both legal and physical custody of the boys[,]" and "objectively the facts do not support the proposition that either parent ceded legal custody or transferred temporary physical custody" to Pam. Accordingly, the court found that Pam was not Max and George's Indian custodian through "physical custody."

Pam's challenge to the finding that she is not Max and George's Indian custodian through physical custody is built on (1) attacking the trial court's underlying finding about Mark's consistent involvement in decision-making for the children; (2) arguing as a matter of statutory interpretation that ICWA allows one parent to transfer physical custody of children to an Indian custodian; and (3) arguing that as a matter of law there is insufficient evidence to support the trial court's finding that Sally did not transfer temporary physical custody of Max and George to Pam.

Pam's attack on the court's finding about Mark's involvement with the children has some merit—he may have had frequent contact with the children before May 2005, but his contact with them after his incarceration for assaulting Sally was infrequent at best. But while Mark's role as an active parent may have been overstated by the trial court, after considering the entire record we hold that the court's finding that neither parent transferred physical custody to Pam is not clearly erroneous. The court heard conflicting testimony,[20] made credibility determinations, weighed the evidence, and reached its conclusion. We defer to the trial court and therefore affirm the finding, without having to address Pam's statutory interpretation argument that only one parent is necessary for the transfer of physical custody to an Indian custodian.

### 2. Edward

■ Edward warrants a different analysis. Pam and Sally claimed that before his birth they agreed Pam would take care of him, and a document to that effect was produced at OCS's October 11 meeting. But the trial court found that OCS had "assumed emergency custody of [Edward] prior to any attempt by [Sally] to transfer legal custody to her mother."

Given Edward's birth and immediate hospitalization and the timing of events at the hospital, including OCS's assumption of emergency custody over Edward the day before Sally signed the ICWA designation form for Pam to be his Indian custodian, we cannot conclude that this finding is clearly erroneous. We affirm the finding that Edward's "temporary physical care, custody, and control" had not been transferred to Pam prior to OCS assuming emergency custody of him, and therefore that Pam was not Edward's Indian custodian through physical custody.

### C. Tribal Custom

Mary Schaeffer, an expert on Kotzebue tribal laws and customs, testified that the Tribe's customs recognize an "Indian custodian" for purposes of ICWA when "a parent entrusts the care of his or her child to [that] person." She testified that no specific words or written agreements are required, nor is the affirmative consent of both parents necessarily required. Based on "facts presented to her by Pam's attorney," Schaeffer ultimately concluded that Pam was "an Indian custodian" of the children pursuant to tribal custom: "I think if you want to put it down on paper, she is . . . an Indian custodian. From our culture, she is already one . . . we need to think about the kids. There's got to be stability with the family." But she also testified that Mark's objection to Pam as the Indian custodian could not be resolved under tribal custom without bringing it before a tribal court.

**20.** *See, e.g.,* the sampling of trial testimony *supra* p. 70.

We conclude from Schaeffer's testimony that Pam *qualified* to be the children's Indian custodian based on tribal custom, but because Mark objected to her designation and the tribal court had not resolved the dispute, Pam *had not yet become* the children's Indian custodian through tribal custom. We therefore affirm the trial court's finding that Pam is not the children's Indian custodian under tribal custom, without deciding whether the court properly interpreted the depth and breadth of ICWA's definition of "Indian custodian."

## V. CONCLUSION

We AFFIRM the trial court's determination that Pam is not the children's Indian custodian under ICWA.

MATTHEWS, Justice, not participating.