**TED W., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

No. S–13130.

Supreme Court of Alaska.

March 27, 2009.

ation of a visitation framework is the appropriate          action.

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee State of Alaska.

Angela Greene, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Mother.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

## OPINION

FABE, Chief Justice.

## I. INTRODUCTION

This appeal arises from the superior court's decision to allow a mother to revoke the Indian custodian status for her child's

father, whose own parental rights to the child had already been terminated. The father's status as the child's Indian custodian under the Indian Child Welfare Act was based solely on the mother's temporary transfer of physical care and custody of the child to the father after termination of his parental rights. After the Office of Children's Services (OCS) removed the child from the father and became the child's temporary legal custodian, the mother joined in OCS's motion to terminate the father's status as the child's Indian custodian. The superior court correctly reasoned that because the Indian custodianship was created solely by the mother's temporary placement of the child with the father, that custodianship could be revoked by the mother who acted in concert with OCS as the child's legal custodian. We therefore affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

Danny was born in November 1998 to Ted and Joanne.[1] Danny is a member of the Native Village of Fort Yukon.[2]

Ted's parental rights to Danny, as well as to Danny's half-sister Teena, were terminated in April 2001.[3] Joanne's parental rights remained intact. In affirming the termination of Ted's parental rights, we described Ted's "long history of alcohol abuse, violence, and incarceration," including convictions for manslaughter, malicious destruction of property, and criminal mischief as well as multiple convictions for assaulting Joanne in the children's presence and assaulting Teena's mother while she was pregnant.[4] Ted appears to have stopped drinking in 2004, but he relapsed on at least one occasion in the fall of 2007 when he was arrested and incarcerated for driving under the influence.

With Joanne's permission, Ted began having unsupervised visits with Danny during weekends in 2002. By 2007 Danny was spending most weekends at Ted's home, from the time Ted picked him up at school on Friday until Ted dropped him off on Sunday night. In late spring of 2007, Ted tried to return Danny to Joanne's care, but no one was home. OCS had taken temporary custody of four of Danny's half-siblings who had been living at the home that Joanne shared with the half-siblings' father. Ted recalled that shortly before OCS told him to not return Danny to Joanne, Joanne asked him to keep Danny because "she didn't want the state involved with [Danny's] life." Danny continued to live with Ted on a full-time basis until August 2007 when OCS removed Danny from Ted's care and filed an emergency petition for adjudication of child in need of aid (CINA) and for temporary custody. A few days after Danny was placed in emergency foster care, he moved to the home of his paternal aunt and supervised visits were arranged for Ted and Joanne.

### B. Proceedings

On August 8, 2007, OCS removed Danny from Ted's home, and the next day, it filed an emergency petition for adjudication of child in need of aid and for temporary custody. Noting that Ted's parental rights to Danny had been terminated and that OCS had substantiated that Ted sexually abused his daughter in 2002, the petition concluded that OCS believed that Danny was a child in need of aid because Joanne had left him with "someone who has no legal rights and is a known sexual offender."

Superior Court Master William Hitchcock held the first hearing on the petition on August 10. OCS requested that the trial court appoint counsel to represent Ted and that it determine whether Ted was Danny's

---

1. We adopt the pseudonyms used by the parties to protect the family members' privacy.

2. The tribe was notified of its right to intervene, but it declined to do so. Through Joanne's affiliation with the Native Village of Gambell, Danny is eligible for membership with that tribe. Gambell was also notified of its right to intervene, and it informed the superior court that it did not intend to intervene.

3. *T.D.W. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 10177, 2002 WL 863289, at *3 (Alaska, May 1, 2002).

4. *Id.* at *1–2.

Indian custodian under the Indian Child Welfare Act (ICWA). OCS also requested that the probable cause hearing be continued until Ted was represented. OCS later stipulated that Ted was an Indian custodian under ICWA:

> We're presented with the somewhat unusual situation of a father, who has previously had his parental rights terminated, deemed, according to the language of ICWA, as someone who a parent transferred temporary physical care, custody and control to. Today, the department is agreeing that [Ted] is an Indian custodian under that definition.

Joanne remarked that she did "not oppose the father being an Indian custodian." The superior court granted Ted's request to be an Indian custodian in September 2007, basing its order "upon an agreement by all parties."

In October 2007 the individual case plans for Ted and Joanne had been established, requiring both of them to obtain substance abuse evaluations and treatments, attend parenting classes, and participate in other activities tailored to their needs. By May 2008 Ted had completed all aspects of his case plan except for obtaining a sex offender assessment and following the subsequent recommendations. By then Joanne had been working towards completing her case plan and assuming sole physical and legal custody of Danny, but she had yet to find affordable housing.

In a hearing before the master in December 2007, Ted requested a trial because he planned to contest that Danny was a child in need of aid. In February 2008 Superior Court Judge Sen K. Tan held a pre-trial conference, where OCS argued that it was not necessary to hold a trial to adjudicate whether Danny was a child in need of aid. Joanne supported OCS's position. OCS explained that Ted, the only party contesting Danny's status as a child in need of aid, should be removed as a party to the case because his Indian custodianship had "dissolve[d]." During the pre-trial conference, the parties and the court agreed that they would brief the issue of dismissing Ted as a party to the case. Soon after, Joanne, OCS, and Danny's guardian ad litem filed a stipulation that Danny was a child in need of aid. That stipulation was accepted by the superior court.

In March 2008 OCS filed a motion requesting that Ted's designation as Danny's Indian custodian be terminated. Joanne joined the motion. Danny's guardian ad litem did not oppose the motion on the condition that Danny would have supervised visits with Ted. In the guardian ad litem's view, it was in Danny's best interests to continue visitation with Ted because they had a relationship with each other. Ted opposed OCS's motion to terminate his status as an Indian custodian. The superior court granted the motion to terminate Ted's Indian custodianship in May 2008, reasoning that OCS and Joanne had effectively withdrawn Ted's Indian custodian status because they were in agreement on the issue and "together they have sole legal and physical custody of [Danny]." The trial court further concluded that a parent and an Indian custodian cannot both be parties to a CINA case in which ICWA applies.

Ted appeals.

## III. STANDARD OF REVIEW

We review on a de novo basis such questions of law as the superior court's interpretation of "Indian custodian" under ICWA.[5] We adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[6] Absent plain error, we will not review issues that were not raised in the trial court.[7] "Plain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[8]

**5.** *Pam R. v. State, Dep't of Health & Social Servs., Office of Children's Servs.,* 185 P.3d 67, 71 (Alaska 2008).

**6.** *Gilbert M. v. State,* 139 P.3d 581, 586 (Alaska 2006) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**7.** *D.J. v. P.C.,* 36 P.3d 663, 667–68 (Alaska 2001).

**8.** *Id.* at 668 (internal quotation marks omitted).

## IV. DISCUSSION

### A. It Was Not Plain Error for the Superior Court To Grant Ted's Motion To Be Designated as Danny's Indian Custodian.

■ The superior court granted Ted's request to be designated as Danny's Indian custodian "[b]ased upon an agreement by all parties" that Ted was an "Indian custodian" under ICWA. The Act defines "Indian custodian" as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." [9]  OCS now argues that granting Ted's motion to be designated as Danny's Indian custodian was plain error because evidence supporting Ted's status as an "Indian person" under ICWA was never presented [10] and because the parties never agreed that Ted satisfied this requirement for being an Indian custodian.  But because the parties agreed to treat Ted as Danny's Indian custodian and never raised his qualifications or his status as an "Indian person" below, we cannot determine on this record that granting Ted's request for Indian custodian status was plain error.

■ We will not consider issues on appeal that were not raised below absent plain error, which exists "where an obvious mistake has been made which creates a high likelihood that injustice has resulted." [11]  We have recognized that it is not erroneous for a trial court to rely on a stipulation of the parties, citing the general rule that "[a] party may not challenge on appeal an order that he has agreed to in the trial court." [12]  Similarly, parties are "bound by their judicial admissions in the superior court." [13]  In *A.B.M. v. M.H.*, we rejected the prospective adoptive parents' contention that the child was not an "Indian child" under ICWA because they signed an adoption questionnaire that fully set out the definition of "Indian child," and they "clearly indicated in the questionnaire that [the child] is an Indian child, that her tribal affiliation is Bethel, and that she is subject to the provisions of the Indian Child Welfare Act." [14]

OCS maintains that while it stipulated that Joanne had transferred physical care, custody, and control of Danny to Ted, it never agreed that Ted is an Indian person.  But at the continued probable cause hearing, OCS remarked:

> We're presented with the somewhat unusual situation of a father, who has previously had his parental rights terminated, deemed, according to the language of ICWA, as someone who a parent transferred temporary physical care, custody and control to.  Today, the department is agreeing that [Ted] is an Indian custodian under that definition.

Joanne also indicated that she did "not oppose the father being an Indian custodian."  At a later hearing, in which the parties discussed with the court their plan to brief the question whether Ted's Indian custodianship could be terminated, the trial court asked the parties if there were "issues of fact that we need to resolve before I can tackle the issue of whether [Ted] is an Indian custodian" and the parties agreed that there were no factual issues to be resolved.  Thus, this issue is not

---

**9.** 25 U.S.C. § 1903(6) (2000).  ICWA's definition of "Indian custodian" contains two classifications of Indian caretakers.  Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual 89 (1984).  Only the second class Indian persons to whom temporary physical custody of an Indian child has been transferred is implicated in this case.

**10.** 25 U.S.C. § 1903(3) defines "Indian" as "any person who is a member of an Indian tribe, or who is an Alaska Native and a member of a Regional Corporation as defined in section 1606 of Title 43."

**11.** *D.J.*, 36 P.3d at 667–68 (internal quotation marks omitted).

**12.** *R.C. v. State, Dep't of Health & Social Servs.*, 760 P.2d 501, 505 (Alaska 1988) (alteration in original and internal quotation marks omitted).

**13.** *A.B.M. v. M.H.*, 651 P.2d 1170, 1174 (Alaska 1982) (citing IX J. Wigmore, Evidence § 2588, at 586 (1940); C. McCormick, Law of Evidence § 262, at 630 (1972)).

**14.** *Id.*

properly before us.[15]

### B. Ted's Indian Custodianship Was Effectively Revoked Under the Facts of This Case.

■ The superior court ruled that together, Joanne and OCS could revoke Ted's designation as the Indian custodian of Danny. The court reasoned that the revocation was effective because Joanne and OCS agreed that Ted's Indian custodianship should be terminated and "together they have sole legal and physical custody of the child." Ted contends that his status as Danny's Indian custodian cannot be revoked during CINA proceedings because "[t]he role of an Indian custodian should logically end when the CINA case ends."

■ The purpose of the Indian custodian status is to recognize and protect the practice of parents in many Indian communities who entrust their children temporarily to the care of extended family members and to mandate that such entrustment does not constitute abuse or neglect.[16] As explained by the House of Representatives in introducing the term "Indian custodian":

> [B]ecause of the extended family concept in the Indian community, parents often transfer physical custody of the Indian child to such extended family member on an informal basis, often for extended periods of time and at great distances from the parents. While such a custodian may not have rights under State law, they do have rights under Indian custom which this bill seeks to protect....

Thus, the Indian caretaker's status as an Indian custodian is derived from the temporary transfer of care of the Indian child by the parent. But Congress did not provide in ICWA that the Indian custodian could usurp the parent's right to raise the child or prevent the parent from rescinding the Indian caretaker's designation as the child's Indian custodian.[17] As long as their parental rights have not been terminated, parents retain legal custody of their children, affording them "the responsibility for making major decisions affecting the child's welfare." [18]

Here, it is uncontested that Ted's status as Danny's Indian custodian was created by Joanne's temporary transfer of Danny's physical care, custody, and control to Ted. And the parties agree that Joanne could have revoked her temporary transfer at any time before the CINA proceedings were initiated. But they dispute the effect that OCS's removal of Danny from Ted's physical custody may have had on Joanne's authority to revoke the temporary transfer.

Ted argues that when OCS removed Danny from his care and initiated the CINA proceedings on August 8, 2007, his status as Danny's Indian custodian was established and could not be altered until the end of the proceedings. Ted reasons that the Indian custodian status "exists as of the precise moment of the filing of the child custody proceeding" and that "[t]he role of an Indian custodian should logically end when the CINA case ends." But Ted cites no authority in support of his position that Joanne was not free to revoke his status once the CINA proceedings commenced. And we have recognized that "[b]ecause under ICWA a physical custodian's right to care for a child flows solely from a parent's 'temporary' transfer of child-care responsibility, the custodial relationship logically may end when a parent

---

**15.** Moreover, OCS fails to point to any evidence in the record that would support a finding that Ted is not an Indian person.

**16.** *See* H.R.Rep. No. 95–1386, at 10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7532 (observing that "many social workers, ignorant of Indian cultural values and social norms, ... frequently discover neglect or abandonment where none exists" because they misunderstand "the dynamics of Indian extended families" that may include more than a hundred relatives who are considered close and responsible family members and to whom parents can entrust care of their children); *id.* at 20, *reprinted in* 1978

U.S.C.C.A.N. 7530, 7543 (explaining that ICWA seeks to protect the rights under Indian custom of people with whom parents entrust temporary care of their children).

**17.** *See id.* (noting that among the rights of the Indian custodian that ICWA seeks to protect is "the right to protect the parental interests of the parents" but not placing the Indian custodian's rights above those of the parents).

**18.** *D.J. v. P.C.*, 36 P.3d 663, 670 & n. 26 (Alaska 2001) (internal quotation marks omitted).

returns and reassumes responsibility for the child's care, custody, and control." [19]

Ted further contends that the superior court's premise that together OCS and Joanne have sole legal and physical custody of Danny is factually incorrect because only OCS has sole legal and physical custody of Danny. Ted points to AS 47.10.084(a), which provides that when a court finds that a child is in need of aid, OCS is the child's legal custodian. But under that provision, parents retain residual rights and responsibilities that may "include, but are not limited to, the right and responsibility of reasonable visitation, consent to adoption, consent to marriage, consent to military enlistment, consent to major medical treatment ..., and the responsibility for support...." [20] As OCS notes, "examination of the residual rights retained by a parent indicates that the legislature intended to reserve to parents the ability to have input into decisions of great importance to a child's future." And the ability to withdraw a temporary transfer of physical custody of a child is "of the same order of importance as" those provided as examples in AS 47.10.084. [21]

Because the only basis for Ted's status as an Indian custodian was Joanne's temporary transfer, because she possessed the authority to revoke the transfer at any time before OCS took custody of Danny, and because Joanne and OCS acted jointly to rescind the earlier transfer, the condition under which

Ted met ICWA's definition of Indian custodian no longer existed. [22] Accordingly, we affirm the trial court's order terminating Ted's designation as an Indian custodian. [23]

## V. CONCLUSION

For the above reasons, we AFFIRM the superior court's decision to terminate Ted's Indian custodianship on the grounds that in this case the Indian custodianship was effectively revoked.

MATTHEWS, Justice, not participating.

---

19. *Pam R. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 185 P.3d 67, 71 (Alaska 2008). *Pam R.* is distinguishable from the present situation because Joanne did not reassume responsibility for Danny's care when she asked the court to terminate Ted's Indian custodianship of Danny while Danny was in the State's custody.

20. AS 47.10.084(c).

21. Because OCS agreed with Joanne that Ted's custodianship should be terminated, we need not address the question whether Joanne could revoke Ted's Indian custodianship over OCS's objection. Moreover, the parties do not raise any argument that Joanne lacked the capacity to revoke the Indian custodianship or that she was coerced by OCS into consenting to its termination.

22. Ted argues that the superior court erred in failing to address his contention that a decision

to terminate his Indian custodianship required finding that doing so would be in Danny's best interests. But once Ted no longer satisfied the condition under which his Indian custodian status was created, he had no authority for asserting that it was in Danny's best interests that he be a party to the case.

23. In affirming on this ground, we need not address the trial court's alternative ground for revoking Ted's Indian custodianship and thus do not reach the question whether both a parent and an Indian custodian can be parties to a CINA case in which ICWA applies. *See M.J.S. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 39 P.3d 1123, 1126 n. 12 (Alaska 2002) ("Our decision affirming the superior court on this ground makes it unnecessary to address the court's findings on alternative grounds....").