NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |
|---|---|
| DILLON P., | Supreme Court Nos. S-19062/19111 (Consolidated) |
| Appellant, | |
| v. | Superior Court No. 1KE-22-00004 CN |
| STATE OF ALASKA, DEPARTMENT OF FAMILY & COMMUNITY SERVICES, OFFICE OF CHILDREN'S SERVICES, | MEMORANDUM OPINION AND JUDGMENT* |
| | No. 2067 – January 8, 2025 |
| Appellee. | |
| FRANK W., | |
| Appellant, | |
| v. | |
| STATE OF ALASKA, DEPARTMENT OF FAMILY & COMMUNITY SERVICES, OFFICE OF CHILDREN'S SERVICES, and DILLON P., | |
| Appellees. | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Katherine H. Lybrand, Judge.

---

\*      Entered under Alaska Appellate Rule 214.

Appearances: Chris Peloso, Ketchikan, for Appellant/ Appellee Dillon P. Frank W., pro se, Ketchikan, Appellant. Aisha T. Bray, Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

In this matter the superior court terminated the parental rights of the father of an Indian child and approved the transfer of the child's placement from one family member to other family members who planned to adopt the child. The father appeals the termination order. He maintains that the Office of Children's Services (OCS) did not make active efforts to reunify him with his child; that his continued custody did not place the child at risk of substantial damage; and that terminating parental rights was not in the child's best interests. The family member with whom the child had initially been placed appeals the placement transfer order. He argues that he was erroneously denied counsel at public expense and that the superior court erred in upholding the placement transfer. Seeing no error in any of the superior court's rulings, we affirm its judgments.

## II. FACTS AND PROCEEDINGS

### A. Facts And Initial Proceedings

Dillon P. and Candice A. are the parents of three-year-old Madeline P.[1] Madeline is an Indian child under the terms of the Indian Child Welfare Act (ICWA).[2]

Madeline was born in May 2022. At birth she experienced withdrawal from methamphetamine exposure in the womb. OCS took emergency custody. OCS

---

[1] Pseudonyms are used to protect the parties' privacy.

[2] 25 U.S.C. § 1903(4).

initially placed Madeline in a tribally licensed foster home. In July OCS placed Madeline with her maternal great-uncle, Frank W.

OCS began to engage Dillon in services to address his addiction. OCS made referrals for Dillon to obtain comprehensive substance abuse and mental health assessments, enrolled him in regular drug testing, and signed him up for parenting courses. He was also advised to attend intensive inpatient drug treatment but ultimately attended outpatient drug treatment.

Dillon's engagement with OCS was marked by periods of compliance and progress followed by relapses. He resided with his mother throughout this time. By January 2023 Dillon visited with Madeline regularly but had not substantially participated in the services provided by OCS or maintained long-term sobriety. But in February 2023 his engagement increased, in part due to the support of his mother, who confirmed the date and time of his visits with Madeline and scheduled drug testing appointments on his behalf. Throughout 2023 Dillon had periods of sobriety, engaged in therapy, and completed parenting courses. He also obtained full-time employment. In September 2023 OCS petitioned to terminate Dillon and Candice's parental rights,[3] alleging that Madeline was at substantial risk of physical harm due to their conduct and their substance abuse.[4]

---

[3] OCS acknowledged Dillon's compliance with his case plan and his sobriety at that time, but noted its legal obligation to file the termination petition when a child has been in foster care for at least 15 of the previous 22 months. *See* AS 47.10.088(d).

[4] *See* AS 47.10.011(6) (providing child is in need of aid if "child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parents"); AS 47.10.011(10) (providing child is in need of aid if "parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child").

In October 2023 Dillon entered a prolonged period of relapse. OCS made repeated efforts to contact him but was unsuccessful. His mother requested a family visit with Madeline for Christmas — Dillon's last visit with Madeline. Then Dillon's mother left town and he again became unreachable.

On a snowy night in January 2024, police responded to a welfare check and found Dillon outside staggering around without shoes. He suffered frostbite injuries on his feet as a result of the incident.

Candice voluntarily relinquished her parental rights in February 2024. A trial for the termination of Dillon's parental rights took place over two days in February and March.

**B.     Termination Trial**

On the first day of trial, Dillon asked for a chance to reengage in services provided by OCS. He testified that his lack of engagement with OCS was due to his shame about his relationship with Candice, his depression, and his frostbite injury.

On the second day of trial, Dillon testified that Candice was emotionally abusive towards him, which interfered with his ability to work with OCS. He testified that Candice was violent towards him on at least five occasions and that OCS did not provide him with services to address this issue. Dillon acknowledged that he was responsible for his relationship with Candice, but he asserted that she did not respect his boundaries and would constantly show up at his house. He testified that he did not notify his mental health providers about the violence because "it [was too] traumatic . . . to even talk about."

The OCS caseworker testified that she was aware of only one incident of violence by Candice, in which Candice broke Dillon's video game console and police were called. She testified that she encouraged Dillon to "engage in mental health services . . . to be able to tell [Candice] no" when she tried to persuade him to use drugs with her. The worker testified that she was unaware that Candice would repeatedly show up at Dillon's residence uninvited.

A child welfare expert described Dillon and Candice's relationship as problematic, noting that Candice likely emotionally abused and manipulated Dillon, primarily to "convince[e] him to use substances with her." The expert testified that Dillon struggled to maintain boundaries with Candice. The expert testified that consistent drug treatment and counseling were the appropriate services to help Dillon with his relationship issues.

But given Dillon's inconsistent progress on sobriety and his recent relapse, the expert testified that Dillon was unlikely to provide a safe and permanent home for Madeline in the near future. The child welfare expert's opinion was supported by a cultural expert from Madeline's tribe, who testified that Dillon's substance abuse and overall absence from Madeline's life went against tribal customs and norms.

## C. Termination Order

In April 2024 the superior court issued an order terminating Dillon's parental rights.

The superior court found clear and convincing evidence that Madeline was a child in need of aid due to Dillon's drug addiction and that he failed to timely remedy his conduct. It found that although Dillon engaged in some substance abuse services, he repeatedly relapsed on fentanyl. The court was not persuaded by Dillon's argument that he did not receive adequate time to remedy his drug abuse. The court found that his most recent relapse suggested that Dillon could not remedy his drug addiction in a reasonable time.

The superior court determined that evidence supported, beyond a reasonable doubt, the conclusion that Madeline would likely suffer serious emotional or physical damage if returned to Dillon's custody. The court accepted the child welfare expert's conclusion that Dillon would continue to use substances that would place Madeline at risk of harm. And it found that the January 2024 frostbite incident demonstrated that Dillon lacked control of his own behavior and would not be able to take care of Madeline.

The court also found clear and convincing evidence that OCS made active efforts to help Dillon reunify with Madeline. It found that OCS provided many services to help Dillon overcome his drug addiction: integrated behavioral health and substance abuse assessment referrals, transportation assistance, parenting classes and visitation, regular case planning meetings, services for Madeline, advocacy services with providers, motivational coaching, and substance abuse treatment. The court was not persuaded by Dillon's argument that OCS's efforts were deficient because it did not refer him to domestic violence services. The court found no indication that "OCS was aware of, or should have been aware of," the dynamic of abuse and domestic violence Dillon described at trial. It found that apart from the one instance of violence involving the gaming console that Dillon reported to OCS, Dillon did not tell OCS about his relationship difficulties with Candice and her harassing behavior. The court noted expert testimony that Dillon was provided the appropriate services to address both his drug use and his relationship troubles. It also found that Dillon declined to tell his mental health providers about his troubles with Candice.

The superior court found that a preponderance of the evidence supported the conclusion that it was in Madeline's best interests to terminate Dillon's parental rights. It found that Madeline was a young child in need of a permanent home that could consistently meet her needs. And it found that adoption rather than guardianship was the culturally appropriate option that best served Madeline's interests.

### D.    Placement Review Proceedings

After removing Madeline from Candice, OCS placed her in a tribally licensed foster home and, later, placed her in the home of her maternal great-uncle, Frank W. As the termination trial approached, OCS proposed changing Madeline's placement to live with relatives who were able to adopt her. Frank, who was in his seventies, agreed with OCS that this arrangement would be best for Madeline.

During the termination trial in March 2024, OCS transferred Madeline's placement. Frank requested a placement review hearing[5] and court-appointed counsel, arguing that he was Madeline's Indian custodian.[6] The superior court denied his request for counsel, ruling that Frank was not Madeline's Indian custodian and therefore not entitled to appointed counsel.

Frank then filed a motion contesting the placement change, arguing that OCS prematurely moved Madeline to her adoptive placement before Dillon's parental rights had been terminated. Frank explained that he did not desire to adopt Madeline. Rather, he wanted Madeline to be placed with him unless and until the court terminated Dillon's parental rights.

The court did not rule on Frank's placement challenge until it issued its order terminating Dillon's parental rights in April 2024. The same day, the court denied Frank's placement challenge on the grounds that his request was moot in light of Frank's request to have placement only so long as Dillon's and Candice's parental rights were intact.

### E.    Appeals

Dillon appeals the superior court's order terminating his parental rights. Frank separately appeals the superior court's order denying his challenge to Madeline's placement.[7] We consolidated the appeals for purposes of briefing and decision.

---

[5]    AS 47.10.080(s); CINA Rule 19.1(b).

[6]    An "Indian custodian" is a legal term of art providing an Indian person with temporary custody of an Indian child with certain legal rights, including the right to counsel. 25 U.S.C. § 1903(6); 25 U.S.C. § 1912(b).

[7]    Dillon participated in Frank's placement appeal as an appellee.

## III.   DISCUSSION

### A.   We Affirm The Order Terminating Parental Rights.

On appeal Dillon challenges three rulings underlying the superior court's order terminating his parental rights:  that OCS made active efforts to reunify him with Madeline; that his continued custody of Madeline put her at substantial risk of serious emotional or physical damage; and that termination of his parental rights was in her best interests.[8]

#### 1.   The superior court did not err in ruling that OCS made active efforts to prevent the breakup of the family.

The superior court may not terminate parental rights to an Indian child unless OCS proves by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts" were unsuccessful.[9]  Whether "active efforts" were made is a mixed question of fact and law.[10]  We review de novo whether OCS's efforts satisfy the ICWA standard.[11]  We review the court's underlying factual findings for clear error.[12]  Clear error exists "if, after a review of the entire record in the light most favorable" to the prevailing party, we are "left with a definite and firm conviction that a mistake has been made."[13]

---

[8]      Dillon does not dispute the court's findings that Madeline was a child in need of aid due to his drug addiction and that he failed to remedy this conduct within a reasonable time.

[9]      25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[10]      *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021).

[11]      *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 556 (Alaska 2017).

[12]      *Ralph H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 255 P.3d 1003, 1007-08 (Alaska 2011).

[13]      *Id.*

Dillon argues that OCS failed to make active efforts to reunify him with Madeline. He does not dispute that OCS provided him many services to help him overcome his fentanyl addiction and maintain a relationship with Madeline. But he argues that OCS failed to help him with the true problem that rendered Madeline a child in need of aid: his allegedly abusive relationship with Madeline's mother, Candice. According to Dillon, he was not able to overcome his addiction to drugs and be a safe parent for Madeline because of emotional and physical abuse by Candice. He argues that the superior court failed to consider that his relapses and periods of disengagement with OCS coincided with his relationship troubles with Candice and that OCS's failure to provide services to address that problem thwarted his success.

The superior court found that Dillon did not disclose to OCS the degree of emotional or physical abuse by Candice that he later described at trial. The court found that Dillon told OCS about only one incident of domestic violence by Candice. It credited the caseworker's testimony that she did not learn about Candice's visiting Dillon at his home and attempting to break in until the termination trial. It found that there was no evidence indicating that OCS "was aware of, or should have been aware of, the dynamic" that Dillon described at trial.

Dillon does not directly acknowledge the court's finding on this point. He asserts that OCS was aware by July 2022 that he was the longtime victim of emotional and physical abuse, but he points only to the single incident in which Candice either threatened to or did in fact damage his video game system and then pushed past him while leaving. The police were called, but no charges were filed.[14] The superior court acknowledged this incident, describing it as the only incident of domestic violence that Dillon brought to OCS's attention. Therefore, we see no clear error in the court's

---

[14] This incident is described in OCS's petition to terminate parental rights and in testimony from the OCS case worker. Although the petition is not evidence, it establishes OCS's awareness of the incident.

finding that OCS was not aware and had no reason to be aware of the degree of Candice's physical or emotional abuse that Dillon described at trial.

This finding is relevant because a parent's actions towards OCS "will necessarily affect the kinds of efforts OCS is able to make toward[s] reunification."[15] For example, a parent's unwillingness to cooperate with OCS will "affec[t] a court's analysis of whether OCS has satisfied its active efforts burden."[16]  The same is true when a parent does not disclose information to OCS.  Because OCS did not have reason to know Candice's behavior was so severe, we cannot say the services it offered to Dillon were deficient.

The efforts OCS provides should be "tailored to the facts and circumstances of the case."[17]  OCS has some discretion to prioritize which services to provide a parent based upon the issues identified in the case.[18]

Based on what OCS knew and had reason to know, it provided Dillon with ample resources to address both his substance abuse struggles and his troubles setting boundaries with Candice.  Contrary to Dillon's claim that OCS "let him languish with nothing more than an admonition to 'stop being weak,'" OCS provided Dillon numerous drug treatment and mental health referrals, motivational coaching, and other efforts.  OCS's expert witness acknowledged that Dillon "fell prey" to Candice's manipulative behavior.  But the expert explained that "if he would stay in treatment and access those other services, . . . that would be the education and information that he needs that would give him some skills to . . . say no to her."  According to this expert,

---

[15]    *Mona J. v. State, Dep't. of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 564 (Alaska 2022).

[16]    *Id.*

[17]    *Id.* at 561.

[18]    *Demetria H. v. State, Dep't. of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1071 n.25 (Alaska 2018).

learning how to resist negative influence from friends and romantic partners is "part of drug treatment." Therefore, we are not persuaded by Dillon's argument that OCS failed to do enough to address Candice's role in his addiction.

Dillon faults OCS for not doing more to help him resist Candice, such as by obtaining a domestic violence protection order or a referral to a domestic violence shelter. But the only incident of domestic violence of which OCS was aware was not so severe that OCS was required to make these efforts.

We therefore reject Dillon's assertion that OCS failed to make active efforts to provide him resources in service of his reunification with Madeline.

### 2. The superior court did not clearly err in finding that Madeline was at risk of substantial damage if returned to Dillon's care.

Termination of parental rights to an Indian child may be ordered only if "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[19] This finding requires "proof that a parent's conduct is likely to harm the child and that the parent is not likely to change [his] conduct."[20] We review this factual finding for clear error.[21]

The superior court found that OCS proved beyond a reasonable doubt that returning Madeline to Dillon would likely cause her substantial emotional and physical damage because Dillon was unable to maintain long-lasting sobriety. The superior court relied on Dillon's relapse, his frostbite incident, and expert testimony as proof that Dillon would be unable to prioritize Madeline's needs as required to safely parent.

---

[19] 25 U.S.C. § 1912(f).

[20] *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1110 (Alaska 2011).

[21] *O'Brien v. Delaplain*, 556 P.3d 1170, 1178 (Alaska 2024) (quoting *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child's Servs.*, 480 P.3d 598, 606 (Alaska 2021)).

Reasoning that Dillon's "history [was] a predictor of his future behavior," the court found that he was unlikely to change his behaviors and maintain sobriety.

Dillon challenges the superior court's finding on two grounds. First, he argues that it fails to account for the role of Candice's abusive behavior and the likelihood that if Dillon received appropriate domestic violence services, he would be able to maintain sobriety. This argument is not persuasive because, as explained above, the superior court found that the drug treatment and counseling to which OCS referred Dillon did provide tools to resist Candice's abusive behavior. But it also found that Dillon did not consistently engage in these services and did not remedy his substance abuse. We cannot say that the superior court clearly erred in finding that "[g]iven [Dillon's] ongoing fentanyl use and lack of sustained sobriety, . . . [Madeline] [wa]s likely to suffer serious emotional or physical harm if returned to him."

Second, Dillon argues that the superior court did not address the fact that he made progress with his case plan while living with his mother and struggled only when she was absent. Because Dillon planned to live with his mother, he argues that the court's failure to address this point makes its finding clearly erroneous. This argument is also unpersuasive. Dillon lived with his mother throughout the proceedings. Dillon's level of engagement did not correlate with his mother's absences. In May 2023 he complied with his case plan while his mother was in Hawaii. But his relapse and non-engagement with OCS from October 2023 to February 2024 overlapped and exceeded his mother's six-week absence in January and February 2024. It was not clear error for the court to give this consideration marginal weight because the record does not suggest that his mother's absence had a substantial impact on his engagement with OCS.

Overall we see no clear error in the court's finding that the return of Madeline to Dillon's care would likely cause her substantial emotional and physical damage.

### 3. The superior court did not clearly err in finding that termination was in Madeline's best interests.

Lastly, Dillon argues that the superior court clearly erred in finding that termination was in Madeline's best interests.[22] He argues that OCS filed the termination petition prematurely, that he substantially complied with his case plan, and that he is not at fault for Madeline's initial exposure to drugs.

The superior court may not terminate parental rights unless it finds by a preponderance of the evidence that termination is in the child's best interests. The court may consider the factors in AS 47.10.088(b)[23] as well as "any other facts relating to the best interests of the child such as . . . the offending parent's lack of progress."[24] "The superior court is not required to consider or give particular weight to any specific factor . . . ."[25] Whether termination of parental rights is in a child's best interests is a question of fact we review for clear error.[26]

We are not persuaded by Dillon's argument that OCS filed its petition to terminate his parental rights too early. Dillon concedes that OCS is statutorily required to file a termination petition after a child spends more than 15 months in foster care unless certain special conditions exist.[27] He maintains that such conditions existed in

---

[22]     CINA Rule 18(c)(3).

[23]     These factors include (1) the likelihood that the child will return to the parent within a reasonable time, (2) the parent's effort to remedy the offending conduct, (3) the harm caused to the child, (4) the likelihood that the conduct will continue, and (5) the history of the parent's conduct.

[24]     *Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 109 (Alaska 2017) (internal quotations marks omitted).

[25]     *Id.* (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1271 (Alaska 2014)).

[26]     *Ralph H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 255 P.3d 1003, 1008 (Alaska 2011).

[27]     *See* AS 47.10.088(d) (requiring OCS to file termination petition when child has been placed in foster care "for at least 15 of the most recent 22 months").

his case because he had made substantial progress on his case plan. But the superior court found that although Dillon completed some of the activities on his case plan, he did not make "significant progress" and was "not successful in maintaining sobriety for a significant period of time." The record supports this finding, particularly the testimony about Dillon's relapse in late 2023 and early 2024.

Dillon's argument that he was not the parent who initially exposed Madeline to drugs is also unpersuasive. The superior court found that Dillon's own fentanyl use placed Madeline at substantial risk of harm due to risk of exposure to the drug, Dillon's own unsafe behavior, and his inability to prioritize Madeline's needs. In light of this finding, which is not clearly erroneous, the fact that he was not the parent who first exposed Madeline to drugs is inconsequential. We therefore see no clear error in the court's finding that terminating Dillon's parental rights was in Madeline's best interests, given her young age and need for permanency.

## B. We Affirm The Superior Court's Placement Order.

Frank, who began caring for Madeline shortly after she was removed from Candice, appeals OCS's decision, shortly after the termination trial, to place her with other relatives hoping to adopt her. Frank challenges both the superior court's decision denying his request for appointed counsel and the substance of the court's placement order. We see no error in the court's decision to deny appointed counsel, and Frank's challenge to the placement transfer itself is moot. Therefore we affirm the superior court's order.

### 1. Frank was not Madeline's Indian custodian.

Frank argues that he was entitled to counsel in Madeline's placement proceedings because he was her Indian custodian.[28] But because Frank did not have

---

[28] Whether a person is an Indian custodian is a conclusion of law we review de novo. *See Pam R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 185 P.3d 67 (Alaska 2008).

legal custody of Madeline and because OCS — not Madeline's parents — placed her with him, Frank is not an Indian custodian for purposes of ICWA and is not entitled to court-appointed counsel.

"Indian custodian" is a term of art describing the legal status of an "Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child."[29]  Indian custodians enjoy a number of legal rights and privileges in child welfare proceedings that would typically be available to the child's parents, including the right to court-appointed counsel.[30]

Congress enacted legal protections for Indian custodians to "protect the practice of parents in . . . Indian communities who entrust their children temporarily to the care of extended family members."[31]  The power to create an Indian custodianship comes from a parent's legal custody of the child.[32]  Accordingly, we held in *Molly O. v. State, Department of Health & Social Services, Office of Children's Services* that when OCS places a child in its custody with an Indian person, that person does not qualify as an Indian custodian.[33]

Frank argues that *Molly O.* infringes on his rights as an Indian person who cared for Madeline, an Indian child, and that he was entitled to recognition as

---

[29]    25 U.S.C. § 1903(6).

[30]    *Pam R.*, 185 P.3d at 69 n.6 (citing 25 U.S.C. § 1912(b)).

[31]    *Ted W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 333, 338 (Alaska 2009) (explaining that " 'many social workers, ignorant of Indian cultural values and social norms, . . . frequently discover neglect or abandonment where none exists' because they misunderstand 'the dynamics of Indian extended families' " (quoting H.R. REP. NO. 95-1386, at 10 (1978))).

[32]    *Id.* ("As long as their parental rights have not been terminated, parents retain legal custody of their children, affording them the responsibility for making major decisions affecting the child's welfare." (internal quotations omitted)).

[33]    320 P.3d 303, 309 (Alaska 2014).

Madeline's Indian custodian. But Frank's argument is contrary to the text of ICWA, which recognizes the creation of an Indian custodian when the "parent" confers temporary care or control of the child to an Indian person.[34]

Dillon argues for the first time on appeal that due process requires a "carveout" of *Molly O.*'s holding so that a parent (like him) who never had legal custody of a child may designate an Indian custodian even after OCS has assumed legal custody of the child. He suggests that the lack of a carveout in such cases would frustrate the legislative intent behind ICWA's Indian custodian provision.

Because Dillon did not make this argument before the superior court, we review it for plain error.[35] Plain error "exists where an obvious mistake has been made which creates a high likelihood injustice has resulted."[36] The superior court did not make an obvious error by following ICWA's definition of "Indian custodian." As we noted, Congress intended the Indian custodian provisions to protect the rights of parents who entrust family members with temporary care of their children.[37] In this case, Dillon did not leave Madeline in Frank's temporary care, so the facts of this case do not implicate Congress's intent.

Dillon's due process argument is also unavailing. To challenge the line Congress drew in its definition of "Indian custodian," Dillon must show that excluding relatives like Frank from the definition of "Indian custodian" has "no rational basis."[38]

---

[34]     25 U.S.C. § 1903(6).

[35]     *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 774 (Alaska 2012).

[36]     *Id.* (quoting *D.J. v. P.C.*, 36 P.3d 663, 667-68 (Alaska 2001)) (internal quotations omitted).

[37]     *Ted W.*, 204 P.3d at 338 (quoting H.R. REP. NO. 95-1386, at 10 (1978)).

[38]     *Burke v. Criterion Gen., Inc.*, 499 P.3d 319, 327 (Alaska 2021) ("Our 'inquiry into arbitrariness' starts with the presumption that the legislative action is

That is not an obvious conclusion here. Congress could reasonably have concluded that protecting tribal custom and the rights of parents of an Indian child does not require granting the right to counsel to a relative chosen by a state agency for foster placement when a parent who never had custody of the child endorses the agency's choice. Indeed, Congress did ensure specific protections for Indian parents, children, extended family members, and tribal members by enacting detailed placement preferences for such circumstances.[39] Therefore it is not obvious that the lines drawn by ICWA's definition of "Indian custodian" lack a rational basis.

In sum, it was not plain error for the superior court to deny Frank legal status as Madeline's Indian custodian.

### 2. Frank's placement challenge is moot.

Lastly, Frank challenges the court's order affirming Madeline's placement change. But Frank only sought placement of Madeline unless and until Dillon's parental rights were terminated. Because the court did terminate Dillon's parental rights shortly after Madeline was transferred to relatives in Juneau, Frank's challenge to the placement change is moot.[40]

## IV. CONCLUSION

The superior court's order terminating parental rights and its order denying the placement challenge are AFFIRMED.

---

proper, and the party challenging the statute on substantive due process grounds must 'demonstrat[e] that no rational basis for the challenged legislation exists.' " (alteration in original) (quoting *Concerned Citizens of S. Kenai Penninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974))).

[39]    25 U.S.C. § 1915.

[40]    "A claim is moot" when it has "lost its character as a present, live controversy." *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 994 (Alaska 2006). "There is no case or controversy for [the court] to decide" when the party seeking relief "would not be entitled to any relief even if [the action] prevails." *Id.*