Filed 2/8/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re E.R. et al., Persons Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.R. et al.,<br><br>        Defendants and Respondents;<br><br>Rafael H.,<br><br>        Defendant and Appellant. | A139939, A142253 & A143702<br><br>(Mendocino County Super. Ct. Nos. SCUK-JVSQ-12-16629, SCUK- JVSQ-12-16630, SCUK-JVSQ-12-16631 & SCUK-JVSQ-12-16632) |

These consolidated dependency appeals involve the proper application of those portions of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq., which delineate the rights of a designated Indian custodian. Rafael H.—a maternal uncle who became the minors' Indian custodian shortly before the commencement of these proceedings—argues that the juvenile court made numerous errors based on its initial failure to recognize his Indian custodian status under federal law.[1] Specifically, Rafael

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

[1] Pursuant to ICWA section 1903(6), an Indian custodian is defined as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or

1

claims that he was not given the mandatory ICWA notices and related advisements required for an Indian custodian; that active efforts were not provided to him in order to prevent the breakup of the Indian family as required by the ICWA; that the juvenile court's detriment finding in response to his request for custody of the children was defective under the ICWA; and that, to the extent any of these issues are deemed forfeited, he was provided ineffective assistance of counsel. In two subsequent appeals, Rafael additionally disputes the propriety of the juvenile court's April 2014 and October 2014 permanent plan orders maintaining the minors in long-term foster care.[2]

Although the juvenile court failed to promptly investigate and confirm Rafael's Indian custodian status in this matter, we conclude that any errors in that regard were harmless under the specific facts of this case. In particular, we find that mother revoked Rafael's Indian custodianship in January 2013, only three months after the commencement of these proceedings.[3] Seeing no error requiring reversal of any of the challenged findings and orders, we affirm.

## I. BACKGROUND*

### A.      *Establishment of Dependency Actions*

The four minors who are the subject of these proceedings—M.A. (born 2001), Victoria A. (born 2003), Victor A. (born 2005), and E.R. (born 2008)—came to the attention of the Mendocino County Health and Human Services Agency (Agency) in September 2012 when the Agency received a referral alleging neglect of the minors by their mother. According to the referral, mother had a substance abuse problem, disappeared for days at a time, and left the children with Rafael, who was unable to provide adequately for their needs due to certain disabilities. Further, the maternal grandmother, who sometimes provided care, had recently been hospitalized and was in a

---

to whom temporary physical care, custody, and control has been transferred by the parent of such child."

[2] On our own motion, we consolidated these three matters for decision on June 25, 2015.

[3] The parties were given the opportunity to file supplemental briefing on this issue, and both filed letter briefs with this court in July 2015.

2

convalescent home. The children were reported to be hungry and wandering around the reservation for hours without adult supervision. Between 2001 and 2011, the Agency had received seven prior referrals for this family, involving similar issues of mother's substance abuse and neglect of the minors.

Mother and the children lived on a property located on the Hopland Band of Pomo Indians (Hopland) reservation with the maternal grandmother, Rafael, and several other maternal uncles. However, she and her children are members of, or eligible for membership in, the Cloverdale Rancheria of Pomo Indians (Cloverdale Rancheria). Thus, as part of the Agency's investigation of the referral, the Agency social worker contacted Ms. Hermosillo, the Cloverdale Rancheria ICWA representative (ICWA Representative). According to the ICWA Representative, mother was a known drug user and was also known for neglecting her children. In addition she stated that eight-year-old Victoria and seven-year-old Victor had never been in school before the current school year, that M.A. had an individualized education plan (IEP), and that all three children were far behind in their education.

In her initial contact with the social worker on October 4, 2012, the ICWA Representative reported that the Cloverdale Rancheria opposed placement of the minors with Rafael and did not want Hopland involved in the situation. Later that same day, she informed the social worker that mother and Rafael had stopped by her office and dropped off an Indian Custodial Designation letter. According to the ICWA Representative, the Cloverdale Rancheria would not recognize this designation because they were not involved with it and mother did not have an ICWA representative sign it. The ICWA Representative further noted that mother was likely to be uncooperative and had brothers who were violent that lived on the property with her. She suggested that the Agency arrange a sheriff's escort before making a home visit. By the time the social worker arrived at the property with the sheriff and the ICWA Representative, however, mother had learned of the visit and fled.

On October 9, 2012, mother and Rafael, along with E.R., finally met with the social worker at the Agency. At that time, mother admitted to using methamphetamine

on a regular basis, appeared to be under the influence, and tested positive for the drug. She also reported that she had never taken the children to the dentist, that she did not know when they had last seen a doctor, and that she had done nothing to address Victoria's crossed eyes. Moreover, mother had no explanation for the fact that E.R. was still wearing diapers and drinking from a bottle at age four; nor could she articulate any reason why Victor and Victoria had not previously been enrolled in school. She was not aware that M.A. had an active IEP. Although mother stated she believed Rafael was capable of caring for her children, she had no answer when asked why the children had been so neglected while Rafael was one of their primary caregivers. At the conclusion of the meeting, mother was arrested on multiple outstanding warrants, and the children were taken into protective custody.

Rafael indicated that he loved the children and had been providing care for them since they were born. At his request, the Agency social workers helped him fill out paperwork so that he could be considered as a relative placement. When contacted, however, the ICWA Representative confirmed that the Cloverdale Rancheria would not approve Rafael as a preferred placement. She also indicated that the Cloverdale Rancheria currently had no Indian homes in mind for placement of the children.

On October 11, 2012, a petition was filed with respect to each of the minors, indicating that they were described by Welfare and Institutions Code section 300, subdivisions (b) and (g), due to mother's neglect, substance abuse, and inability to arrange for their care.[4] Mother was present in custody at the detention hearing on October 12, 2012, along with Rafael and the ICWA Representative. Mother submitted the matter, indicating that she hoped to engage in substance abuse treatment when she was released from custody, and the minors were formally detained at that time. The juvenile court noted that the case fell under the ICWA due to the children's affiliation with the Cloverdale Rancheria. According to the social worker, she was working with

_____

[4] The four children have three separate fathers, two of whom reportedly reside in Mexico. The fathers have not been involved in the children's lives for many years. Neither they nor mother are involved in these appeals.

the tribe on placement. However, as stated above, the Cloverdale Rancheria opposed placement of the minors with Rafael.

According to the jurisdictional report, mother admitted that she had been using methamphetamine since she was 12 years old. Indeed, her criminal record disclosed nine arrests involving controlled substances between 2006 and 2012. At that point, however, mother wanted to enter drug treatment and "get her life back on track." She thus submitted to jurisdiction on November 14, 2012, and the juvenile court found the allegations in the petition true. The ICWA Representative was again present. At the hearing, mother's attorney requested that Rafael be considered for placement, indicating that mother would not return to the maternal grandmother's home if the minors could be placed with Rafael on the Hopland property.

Disposition was continued to develop appropriate services for mother and to obtain the involvement of an ICWA expert as required by federal statute. (See 25 U.S.C. § 1912(e).) In its dispositional report, the Agency indicated that it continued to communicate with the Cloverdale Rancheria to determine appropriate services, placement, and recommendations for the family, and to identify possible supports. Both the Agency and the Cloverdale Rancheria, however, remained opposed to placement of the minors with Rafael due to "him being one of the care takers for the children who contributed to their neglect and exposure to the negative effects of drugs." Further, it was "apparent" to the Agency that Rafael "suffers from some type of developmental disability which does not allow him to be able to fully comprehend spoken words or provide regular and appropriate care for the children." Moreover, with respect to the appropriateness of Rafael's housing, mother stated that she knew she would start using again if she returned to the Hopland property because she had used methamphetamine there with her brothers. Although opposed to placement of the minors with Rafael, the Agency was providing supervised visitation between him and the children.

5

Meanwhile, the children were being assessed in their various foster care placements.[5] E.R. was diagnosed as failure to thrive and anemic. Since she was only drinking milk from a bottle, a plan was made to introduce the four year old to solid foods. In addition, the young minor presented with severe delays in expressive language, some difficulty with receptive language, and developmental delays in other areas such as potty training. Victoria, although behind academically, was described as an eager learner. She was being assessed for vision issues. However, it was observed that Victoria craved attention, was bossy and controlling, and could be mean to E.R., sabotaging her progress. Victoria was diagnosed with anxiety and a disruptive behavior disorder.

Victor was also delayed academically, but was motivated and excited to be learning. He reported feeling "stupid" in class because he was aware he was behind. Victor also presented with symptoms of trauma and anxiety, such as nightmares, insomnia, and an obsession with jail and the police. He was diagnosed with post traumatic stress disorder and depression and had cavities that needed filling.

With respect to M.A., his teacher reported that he was one of the three toughest children in the school to teach because he did not understand why he had to learn concepts he did not use, was disruptive during class, and had little regard for other students during recess. He had an active IEP and was "below standard" in almost all subjects, although he was closing the gap. M.A. presented as "parentified, shut down, quiet, bored, passive, irritable and angry." He tended to be uncooperative and disruptive and was diagnosed with depression, oppositional defiant disorder, and attention deficit hyperactivity disorder (ADHD). M.A. also had cavities that needed filling.

In advance of disposition, a declaration was provided by Indian expert Lorraine G. Laiwa. Ms. Laiwa opined that "active efforts" had been made in this case "to provide remedial services and rehabilitative programs designed to prevent the breakup of this

_____

[5] Victoria and E.R. were placed together in foster care. Victor and M.A. were each placed separately in other foster homes. Because of reports that Victoria was interfering with E.R.'s development, however, plans were being made to place the girls individually. The minors' placements were approved by the Cloverdale Rancheria.

Indian family." She further stated that continued custody of the children by their mother would likely "result in serious emotional and physical damage to the children" and that it was in the minors' best interests to be placed in their current foster homes. At the dispositional hearing on January 8, 2013, Ms. Laiwa gave similar testimony. She expressly stated that she did not look into the possibility of placement with Rafael as part of her analysis, however, because she believed that it was the job of the Cloverdale Rancheria to determine placement. She did indicate, though, that it was her understanding that Rafael and mother had been working together in raising the children prior to their removal. Thereafter, all four minors were declared dependent children of the juvenile court and reunification services were ordered for mother. Mother's attorney again asked that a hearing be held regarding whether Rafael was an appropriate placement for the children. The matter was thus continued to January 30, 2013, for ICWA review and placement issues.

## B.    *Indian Custodian Placement Issues*

At the January 30 hearing, the juvenile court formally concluded that the ICWA applied to the case. With respect to placement, however, Agency counsel indicated that she believed mother—who was in residential treatment—had withdrawn her request to have the minors placed with Rafael. Mother's counsel claimed, in contrast, that mother still supported placement with her brother, but no longer sought a contested hearing on the issue. Rafael also spoke for himself, indicating that he had raised M.A. since he was three months old and Victor since he was three. He further claimed that he had "tried everything" to "get the kids back." The juvenile court continued the matter to February 19 so that it could be provided with more information regarding Rafael's suitability as a placement option.

Prior to the February 19 continued hearing, the Agency filed a report confirming its recommendation against placement with Rafael. The report detailed two Agency visits to the Hopland property where Rafael lived. While the social worker felt that Rafael's home, itself, appeared neat and up to community standards, the house was only 10 feet away from the grandmother's home, where the minors were living at the time of

7

their removal.  In addition, Rafael lived with his brother, Darrel P., who had a criminal history including battery and possession of cannabis.  Another brother, Joel R., lived in a barn on the edge of the property and had an extensive criminal history, including many arrests for possession of controlled substances, firearms, and drug paraphernalia.  The Agency further reported that, on January 16, 2013, mother told the social worker that she wanted her children to remain in foster care rather than being placed with Rafael because there were drugs at the property, Rafael did not have a car, and she did not want her children living on the reservation.  Mother contacted the social worker from residential treatment a second time in February 2013, reiterating her objection to the minors being placed with Rafael.

Rafael met with the social worker in January 2013, stating his desire to parent the four children as he had in the past.  According to the social worker, it was difficult to follow Rafael's conversation.  He reported that he had been on disability since being involved in an accident in the 1990s, but could provide no details of the incident.  Instead, he repeatedly stated that it was a miracle he could walk.  In addition, Rafael could not recall the name of his doctor or any specific type of care that he had received.  Rafael denied any drug or alcohol use on the Hopland property.  Although he did not have a car, Rafael believed that the Hopland tribe might help him with transportation for the children.  The social worker later confirmed that, because Rafael lived on the Hopland reservation, he would be eligible for some limited transportation services to and from the health clinic.  Finally, Rafael  provided the social worker with a letter of reference from a Hopland resident, stating that the minors always seemed happy and cared for to "the best of Rafael's ability."  The author further noted that, even with the "limited resources" Rafael had, the "one real positive thing" the minors had was Rafael's "positive influence."

At the hearing on February 19, mother's attorney withdrew his request to place the minors with Rafael due to mother's change of heart.  Rafael, however, provided the court with a copy of a Designation of Indian Custodian dated October 4, 2012, and apparently signed by mother, which purported to grant temporary custody of the minors to Rafael

several days before they were taken into protective custody by the Agency (Designation).[6] The juvenile court thus continued the matter to February 26, 2013, so that mother's current desires with respect to the Designation could be ascertained, the authenticity of the Designation could be determined, and the Cloverdale Rancheria's position with respect to the Designation could be provided.

Mother's attorney reported to the court on February 26 that mother did not want to revoke the Designation at that point. The juvenile court therefore appointed an attorney for Rafael and the matter was continued several times so that Rafael's attorney could familiarize herself with the case. Thereafter, at a hearing on March 28, 2013, Rafael's attorney argued that—as the minors' Indian custodian—Rafael was entitled to custody, absent testimony by a qualified expert witness that placement with him would be detrimental to the children. (See 25 U.S.C. § 1912(e).) In support of his request for return of the minors, Rafael submitted a declaration describing his living situation, providing specific examples of the ways in which he had cared for all four minors over the years for "extended periods of time," and supplying photographs and other evidence underscoring his close relationship with the minors. Rafael further indicated that his disability did not prevent him from caring for the minors, arguing that he had proved his

---

[6] The Designation provides in full as follows: "I, [mother], am the legal guardian of [M.A.; Victoria A.; Victor A.; and E.R.]. I hereby voluntarily transfer the care and custody to: [Rafael H.] and, pursuant to the Indian Child Welfare Act (ICWA) 25 U.S.C. 1901, et seq., I hereby designate him as the Indian Custodian. [¶] I understand that [Rafael H.] is a member of the CLOVERDALE TRIBE and that he has, based upon our Indian community standards and other applicable standards, the ability to provide my children with the physical and emotional needs necessary to their proper upbringing. [¶] I do hereby authorize [Rafael H.] to consent to any educational or medical treatment and hospital care of my children listed above which is deemed advisable. It is understood that this authorization is given in advance of any specific educational needs or medical diagnosis, treatment or hospital care being required but is given to provide authority and power on the part of [Rafael H.] to give specific consent to educational needs or medical care and treatment. [¶] This placement is revocable pursuant to the terms of the Indian Child Welfare Act (ICWA). By making this placement I do not waive my rights under the Indian Child Welfare Act to notice in any future state court proceeding involving the custody of my grandson" [sic].

ability to care for them "by the fact that I cared for them very well in the past." He asserted that his inability to drive did not make him an inadequate caregiver. He also declared that he and his mother were prepared to have his brothers leave the Hopland property if the minors were returned.

Although they acknowledged Rafael's relationship with the minors, both Agency counsel and counsel for the minors opposed placement with Rafael. The juvenile court found that the record contained clear and convincing evidence against such a placement, noting that neither the Cloverdale Rancheria nor mother supported placement with Rafael, that Rafael was involved in the care of the minors while they were neglected prior to their detention, and that Rafael's two brothers still resided on the Hopland property. Despite this finding, at the suggestion of the Agency, the juvenile court continued the matter further so that the opinion of a qualified Indian expert could be obtained.

At a hearing on April 24, 2013, Agency counsel reported that she had spoken with the ICWA Representative, who indicated that the Cloverdale Rancheria did not recognize Rafael as the minors' Indian custodian and still did not support placement with him. By May 16, 2013, an Indian expert had been identified. Nevertheless, a further continuance was granted so that the Agency could explore a possible placement of the children together and a more satisfactory visitation schedule for Rafael, in hopes of resolving the matter without the need for a contested placement hearing. On June 13, 2013, however, Rafael's attorney indicated that her client was unwilling to settle the matter and withdraw his request for custody of the minors. The dependency actions were therefore again continued for a contested placement hearing.

In the meantime, a six-month review of mother's reunification efforts was held on June 25, 2013. Unfortunately, after completing a residential drug treatment program on April 10, 2013, mother relapsed on methamphetamine less than a week later. Due to her lack of compliance with the terms of her reunification plan, mother lost her housing and stated that she was spending some nights on the Hopland property with her mother and Rafael. She further reported that her other two brothers who resided on the property used methamphetamine regularly. Reunifications services were continued for mother.

10

At this time, due to the children's behaviors and the level of intervention needed, the minors were all placed in separate foster homes. In fact, M.A. was approved for Intensive Treatment Foster Care in May 2013 based on his continued behavioral concerns, including defiance, name calling, cussing, throwing objects, pushing, physical displays of intimidation, trouble with emotional regulation, self-harming behaviors, suicidal ideation, intentional destruction of property, and lack of concern for others. At school, he would spend time in class making loud noises and rolling on the ground. He was inappropriate with girls, defiant to authority, and engaged in angry outbursts. He was suspended twice during the school year for being physical with peers. Victoria was diagnosed with immunization delay, hyperopia, astigmatism, anisometropia, and childhood caries. With respect to her vision issues, she was prescribed glasses and a eye patch to wear for a period of time each day. Victoria also had an active IEP for an intellectual disability and had been referred to the Redwood Coast Regional Center.

Although described as wanting to learn, Victor presented as very weak academically and with little enthusiasm for the learning experience. He was working with an individual rehabilitation specialist on goals such as expressing his emotions, processing traumatic events, feeling safe and trusting, identifying stress, learning relaxation techniques, and improving developmental tasks in school and in social settings.[7] After being diagnosed as failure to thrive, E.R. was putting on weight, although she remained a very picky eater. She had also begun talking, after having almost no language when she entered foster care. However, she was often defiant in her foster home and would just stare at the foster parent when asked to complete a task.

After a number of further continuances so that the Indian expert could meet with Rafael and the children, review necessary documents, and draft a report, the contested placement hearing was finally held on September 4, 2013. In advance of this hearing, the Agency filed several reports with the juvenile court, supporting its continued recommendation against placement with Rafael. It informed the court, for example, that

_____

[7] In August 2013, shortly after the 6-month review, Victor was moved to the home of a maternal aunt.

Rafael had been found to be permanently disabled by the Social Security Administration (SSA) since his July 1993 accident and received benefits "with a Payee required." His mother had always been his payee. According to the SSA, if Rafael needed a payee it meant that he was "not capable of managing his own funds or managing interviews." In addition, according to Rafael's medical doctor, he was not capable of doing job interviews.

The designated Indian expert, Dr. Singer, also submitted a detailed report. She emphasized that there was "no doubt" that Rafael loved the children and that they loved him. Moreover, the children had all indicated at various times that they wanted to be placed with Rafael or to " 'come home.' " Dr. Singer also indicated that Rafael was able to provide for some of the children's basic needs. She concluded, however, that "unfortunately, he does not have the ability to manage nor provide for these four children, each of whom has some significant cognitive and behavioral challenges."

Indeed, testing by Dr. Singer revealed that Rafael's level of intellectual functioning placed him in the "extremely low" category of cognitive ability. Specifically, Rafael showed "significant challenges with memory, the ability to shift sets, the capacity to understand complex directions, abstract thinking, concentration, and attention." His "range of ideas" and "fund of knowledge" were limited, and he functioned in a concrete manner. Moreover, Dr. Singer found it "quite likely" that his head injury "significantly affected his language processing abilities, working memory and processing speed." Finally, Rafael showed a poor capacity to recall details and had limited information regarding historical events. His insight and judgment appeared poor.

In addition, information obtained by Dr. Singer from the minors' past and current foster parents underscored each child's significant needs. M.A., for example, exhibited constant behavioral challenges in his foster home, including yelling, cussing, hitting, stealing money and snacks, keying two of the family's cars, urinating over all of the bathroom, and destroying property. Moreover, M.A. was described by one of his teachers as a " 'feral cat,' " and it took "somebody to sit with him every day, every minute, to get his homework done." Indeed, M.A., Victor, and Victoria all had

12

significant challenges functioning at school and needed help with school follow through. Victoria, in addition, had issues with comprehension and transitions. E.R. needed help catching up developmentally and showed challenges with speech, eating, and behavior.

Dr. Singer concluded that each of the minors needed a parent or guardian who could "understand their challenges and provide for them on a day to day basis an organized plan that focuses on rudimentary academic tasks, helps them to develop better behavioral control and understands and supports their specific and age appropriate developmental needs." In her opinion, Rafael was "incapable of providing these structures for the children" due to his cognitive deficits. In fact, Dr. Singer had concerns about M.A., Victor, and Victoria being able to manipulate Rafael to get what they wanted. In addition, each of the minors participated in a number of activities outside of school which were "necessary to correct the deficits that resulted from the care that these children received prior to their removal," and these activities required planning and organization which would, in Dr. Singer's opinion, pose a significant challenge for Rafael. In sum, Dr. Singer believed that the complexity of having all four children together would be "just too challenging" for Rafael. And she could not recommend that any of the children be placed with him.

At the hearing on September 4, Dr. Singer was designated as an Indian expert and an expert in clinical and forensic psychology. Her testimony reiterated her position on placement. For instance, Dr. Singer noted with respect to M.A. and Victor that "from a psychological perspective . . . they're probably more sophisticated and savvy than their uncle is." Dr. Singer also commented that, if it was true that Rafael had cared for M.A. as much as he said he had and M.A.'s behavior was as bad as it was, it told her that M.A. "has had parenting that is substandard."

Rafael also testified regarding his desire and ability to care for the children. Thereafter, his attorney argued that no "active efforts" were made, as required under the ICWA, to prevent the removal of the children from Rafael, their Indian custodian. She further claimed that there was insufficient evidence of detriment to the minors if they were placed with Rafael and asked that the children be returned to his care. Both the

13

Agency and the attorney for the minors, in contrast, argued against placement with Rafael.

The juvenile court—noting it was relying heavily on Dr. Singer's report—refused to grant physical custody of the minors to Rafael. The court concluded that such a placement would be detrimental to the minors, indicating that "each of the children have their own particular needs and it requires strong parenting." The court also looked at the involvement of the Cloverdale Rancheria and the fact that the tribe did not support placement with Rafael. It was concerned that the children had been removed from the Hopland property which included Rafael's residence and where all four had been neglected. In sum, as the court opined: "In a way, I think it's one of those proof-is-in-the-pudding things. The four children are doing very badly. To the extent that [Rafael] has been involved in their nurturing, it hasn't worked." Rafael filed a timely notice of appeal with respect to the juvenile court's placement decision.

## C.     *Establishment of Permanent Plans for the Minors*

In its 12-month review report, the Agency recommended that reunification services for the minors' mother be terminated because she had failed to adequately address her substance abuse problem, had not visited with the children since June 2013, and had failed to comply with other requirements of her reunification plan. With respect to the children other than Victor, the Agency opined that, by clear and convincing evidence, no potential for adoption, tribal customary adoption, or legal guardianship existed. It therefore recommended a permanent plan of long-term foster care for E.R, Victoria, and M.A. Referral for a permanency planning hearing was initially recommended for Victor so that a permanent plan of guardianship with the maternal aunt he was placed with could be pursued. However, in an addendum report filed prior to the hearing, the Agency indicated that the maternal aunt was concerned about certain behavioral issues that had arisen with Victor and wanted the opportunity to resolve those problems through therapeutic services before moving forward with guardianship. Thus, the recommendation for Victor was changed to long-term foster care.

14

M.A. continued to have a host of behavioral problems, but was responding well to a behavioral intervention plan instituted by his foster parents and was making "subtle improvements" in his school behavior. Victor was reported to have had five disciplinary actions since the beginning of the school year for disruptive, aggressive, and lying behaviors. However, he was noted to be progressing in all areas addressed by his rehabilitation services, including expressing emotions and processing trauma. Victoria had been approved for Intensive Treatment Foster Care in August 2013, due to her need for constant supervision and in the hopes that her current placement could be maintained. Although E.R. was making progress on her dietary and speech needs, it was felt that she needed a higher level of care and so other placement options were being considered for her. Specifically, E.R. was often defiant, and her comprehension and coping skills were extremely deficient, if not absent. In addition, she was having problems with urinating and defecating on the carpet and floors throughout the house, a behavior which worsened after visits with her siblings, uncle, and other relatives.

At the 12-month review hearing on November 12, 2013, the social worker indicated that Rafael was currently receiving two visits each month. The Agency was requiring that the visits be supervised on Agency grounds, however, because of concerns that Rafael and the maternal grandmother had repeatedly violated the visitation agreement by talking to the minors about placement. In addition, Rafael had allowed unsupervised contact between M.A. and mother over his cell phone. Thus, although M.A. wanted more contact with Rafael, the juvenile court declined to actually order an increase in visitation. Thereafter, the juvenile court adopted the recommendations of the Agency, terminated mother's reunification services, and ordered all four children into long-term foster care.

In its report for the first semi-annual review of the minors' permanent plan, M.A.'s therapist reported that the minor "follows a destructive emotional and behavioral pattern in correlation with supervised family visits." However, his foster care case manager saw increased bonding and improvement in M.A.'s behaviors. Victoria had recently been found eligible for services through the Redwood Coast Regional Center, and her

treatment plan was being developed. She continued to see a therapist to "address behavioral outbursts and defiant behaviors that seem to exacerbate around family visits." Victoria's therapist also noted, however, that the minor was beginning to understand why children need to listen and follow the rules of adults, which was a "huge accomplishment" for her.

With respect to Victor, the maternal aunt had recently stated that she could not keep the minor due to his behaviors. Thus, Victor was placed in a non-relative extended family member home in March 2014, where he seemed to be adjusting. E.R. had been assessed for regional center services and it was determined that her issues did not stem from a developmental disability. Rather, her diagnoses were language disorder, neglect, and post traumatic stress disorder. E.R.'s defiant behaviors were more apparent after family visitation. She was granted a higher level of care in October 2013 and moved to a new foster home the next month. Although the social worker attempted to maintain contact with the ICWA Representative about the appropriateness of the minors' placements, the ICWA Representative was nonresponsive. Because of ongoing issues with family visitation and the minors' negative behaviors after that visitation, the social worker recommended that family visitation occur a minimum of one hour per month.

At the review hearing on April 22, 2014, the minors were continued in long-term foster care. Rafael's attorney, however, objected to the proposed limitation on her client's visitation with the minors. The juvenile court expressed concern about the children, stating: "[F]rankly, this was a troubling report. They're not doing very well." It ordered once per month family visitation in an attempt to "try something to help the children stabilize." In addition, however, it gave the Agency the discretion to add a therapeutic visit each month between Rafael and the children if the Agency could arrange it. Rafael filed a timely notice of appeal with respect to this hearing.

In its report for the second semi-annual review of the minors' permanent plans, the Agency noted that M.A. had made significant progress in being able to communicate his needs, a change which his therapist attributed to the safe and stable nature of his foster care placement. M.A. had also been able to moderate his emotions more effectively and

16

was more outgoing, cooperative, and confident. In July 2014, Victoria changed placements after her foster parent retired. She was able to be placed in the same home as her brother Victor. Prior to this placement change—after receiving no response from the ICWA Representative—the social worker contacted the Sacramento Bureau of Indian Affairs and was told that no tribal placements were available.

Victor seemed to be doing much better socially since being placed in his new home. E.R. was evaluated for possible medication. While no medication was prescribed, she was diagnosed with disruptive behavioral disorder, speech articulation disorder, and developmental delay. She was reported, however, to be making significant progress in her ability to vocalize her wants and needs and her moods had also stabilized.

The children were visiting with Rafael for one hour each month. According to the Agency, Rafael had brought inappropriate snacks and extravagant gifts to the visits, which caused behavior problems for each of the children. The Agency worked with him on a list of acceptable gift ideas.

At the second semi-annual permanent plan review on October 8, 2014—after the court denied Rafael's motion to replace his court-appointed attorney—the matter was continued so that more information could be provided to the court regarding certain recent events. Thereafter, the Agency supplied an addendum report which detailed, among other things, a September 9, 2014, report received from Rafael by the Agency regarding the suspected abuse of Victor by his foster parents. The Agency investigated and determined that the report was unfounded. Apparently, Rafael had unsupervised contact with Victor at an Indian celebration and led the minor to believe that he would be placed with Rafael if he "got into enough trouble in his foster home." In addition, the social worker described reports of defiant behaviors and aggression from the children after family visits. Finally, M.A. had not engaged in therapeutic visits with Rafael as M.A.'s therapist felt it was in the minor's best interest to instead bond with his foster family. The Agency recommended that visitation with Rafael be terminated. Monthly sibling visitation would continue.

17

At the continued review hearing on October 22, 2014, the minors were maintained in long-term foster care. With respect to visitation with Rafael, Rafael's attorney announced an agreement among the parties. Specifically, visitation between Rafael and the children would continue for one hour monthly, supervised by the Agency. Thereafter, the juvenile court rejected a proposed stipulation between the parties with respect to therapeutic visitation and ordered an additional therapeutic monthly visit between Rafael, M.A., and Victor. Rafael filed a timely notice of appeal with respect to this hearing.

## II. DISCUSSION

### A.     *Status of the Indian Custodian*

Congress enacted the ICWA in 1978 "in an effort to protect and preserve Indian tribes and their resources." (*In re G.L.* (2009) 177 Cal.App.4th 683, 690 (*G.L.*); see 25 U.S.C. § 1901.) Specifically, the ICWA codifies "the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." (25 U.SC. § 1902.) Thus, " '[t]he ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource.' " (*Guardianship of D.W.* (2013) 221 Cal.App.4th 242, 249 (*D.W.*).) In order to best effectuate these policies, the ICWA is construed in accordance with "the canon of construction that statutes enacted for the benefit of Indians are to be liberally construed to their benefit." (Bureau of Indian Affairs, Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146, 10150 (Feb. 25, 2015) (Guidelines); see also *In re Jack C.* (2011) 192 Cal.App.4th 967, 977 [the ICWA "shall be liberally construed to effectuate its purposes and preferences"].)

As stated above, the ICWA defines an Indian custodian as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of

18

such child." (25 U.S.C. § 1903(6); see also Welf. & Inst. Code, § 224.1, subd. (a)[8] [adopting the ICWA's definition of Indian custodian in California].)  The Indian custodian concept was added to the ICWA "to recognize and protect the practice of parents in many Indian communities who entrust their children temporarily to the care of extended family members and to mandate that such entrustment does not constitute abuse or neglect."  (*Ted W. v. State of Alaska* (Alaska 2009) 204 P.3d 333, 338, fn. omitted (*Ted W.*).)  As explained in the House report on the ICWA:  "[B]ecause of the extended family concept in the Indian community, parents often transfer physical custody of the Indian child to such extended family member on an informal basis, often for extended periods of time and at great distances from the parents. While such . . . custodian[s] may not have rights under State law, they do have rights under Indian custom which this bill seeks to protect, including the right to protect the parental interests of the parents."  (H.R.Rep. No. 95-1386, 2d Sess. (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 7530, 7543; see *G.L.*, *supra*, 177 Cal.App.4th at p. 691.)

Under the ICWA, an Indian custodian "stands in the shoes of the parent and enjoys favored status."  (*G.L.*, *supra*, 177 Cal.App.4th at p. 692.)  Thus, for instance, an Indian custodian—like a parent or the Indian child's tribe—is entitled to notice of any involuntary child welfare proceeding involving foster care placement of, or termination of parental rights to, the Indian child.  (25 U.S.C. § 1912(a); § 224.2, subd. (a); rule 5.481(b).)  Further, the Indian custodian has the right to intervene at any point in such a proceeding, and the notice provided must apprise the Indian custodian of that fact.[9]  (25 U.S.C. §§ 1911(c) & 1912(a); § 224.2, subd. (a)(5)(G)(i); rule 5.482(e).)  Additional rights afforded the Indian custodian include the right to court-appointed counsel if

---

[8] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.  All rule references are to the California Rules of Court.

[9] "Allowing an Indian custodian to intervene 'is necessary because foster care placements and/or termination of parental right proceedings may forever alter the custodial rights of the Indian custodian and Congress believed it important that Indian custodians be treated similarly [to] parents in child custody proceedings.' "  (*G.L.*, *supra*, 177 Cal.App.4th at p. 692, fn. 2.)

19

indigent and the right to an additional 20 days to prepare for the proceeding. (25 U.S.C. § 1912(a) & (b); § 224.2, subd. (a)(5)(G)(iii) & (v); rule 5.482(a)(3).)

Moreover, before a minor subject to the ICWA can be placed in foster care, the court must make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(e); see §§ 224.6, 361, subd. (c)(6), 361.7, subd. (c); rule 5.484(a).) And, finally, "[a]ny party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[10] (25 U.S.C. § 1912(d); §§ 361, subd. (d), 361.7, subd. (a); rule 5.484(c).) With these statutory mandates in mind, we turn to the facts of this particular case and will review independently the issues of statutory interpretation raised. (*In re R.C.* (2011) 196 Cal.App.4th 741, 748; cf. *Ted W.*, *supra*, 204 P.3d at p. 336.)

Here, mother executed a Designation of Indian Custodian (Designation) on October 4, 2012, several days before the minors were taken into protective custody by the Mendocino County Health and Human Services Agency (Agency). The Designation was revocable by its express terms and transferred temporary care and custody of the minors to Rafael as their Indian custodian under the ICWA. The record in this case reveals that the Agency was made aware of the existence of the Designation on the same day that it was executed, when the Cloverdale Rancheria ICWA Representative (ICWA Representative) told the social worker that mother and Rafael had stopped by her office and dropped off the signed document. The ICWA Representative, however, further

---

[10] With respect to "active efforts," section 361.7, subdivision (b), provides as follows: "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers."

informed the social worker that the tribe would not recognize the Designation because they were not involved with it and mother did not have an ICWA representative sign it.

We disagree with the Cloverdale Rancheria of Pomo Indians (Cloverdale Rancheria) that the Designation executed by mother and Rafael in this case was insufficient to establish Rafael as the minors' Indian custodian. In fact, the statutory authority for designation of an Indian custodian does not even require a writing, and such temporary transfers to extended family are often done on an informal basis. (*G.L.*, *supra*, 177 Cal.App.4th at p. 693.) We thus conclude that—as an Indian person "to whom temporary physical care, custody, and control [had] been transferred by the parent"— Rafael became the Indian custodian of the minors for purposes of the ICWA on October 4, 2012. (25 U.S.C. § 1903(6).)

Unfortunately, although the Agency was made aware of the Designation on the day it was executed, it did nothing to verify or implement its contents, perhaps relying on the Cloverdale Rancheria's conclusion that the document was invalid. Moreover, the existence of the Designation was reported in the social worker's case notes attached to the Agency's October 12, 2012, detention summary. Yet neither the juvenile court nor any of the parties raised the issue of Rafael's status until Rafael finally provided the court with a copy of the Designation over four months later, on February 19, 2013. Under these circumstances, we believe it was error for the Agency and the juvenile court not to have inquired further with respect to the import of the Designation at the commencement of these proceedings.

However, our review of the record further reveals that, on January 16, 2013, mother spoke with the social worker by telephone from her residential treatment center. During that conversation, mother told the social worker that she wanted her children to remain in foster care rather than being placed with Rafael because there were drugs at the house, Rafael did not have a car, and she did not want her children living on the reservation. Specifically, she stated: " 'There are drugs on that property, and I want my kids safe, away from all of that, and the drugs.' " Mother contacted the social worker from residential treatment a second time on February 4, 2013, reiterating her position and

21

noting that " 'living out there was a bad situation with me, and I don't want that for the kids.' "[11]

Under strikingly similar circumstances, the Supreme Court of Alaska recently concluded that—by informing the child welfare agency of their opposition to their dependent children being placed in the Indian custodian's care—the parents acted to terminate the Indian custodianship. (*Molly O. v. State of Alaska* (2014) 320 P.3d 303, 308-309 (*Molly O.*) [by telling the child welfare agency "that they did not want their children placed with [the Indian custodian], [the parents] effectively informed [the child welfare agency] that any grant of physical care, custody, and control they may have earlier given [the Indian custodian] over their children no longer existed"].) This makes sense as "the Indian caretaker's status as an Indian custodian is derived from the temporary transfer of care of the Indian child by the parent. But Congress did not provide in ICWA that the Indian custodian could usurp the parent's right to raise the child or prevent the parent from rescinding the Indian caretaker's designation as the child's Indian custodian." (*Ted W.*, *supra*, 204 P.3d at p. 338, fn. omitted; see *id.* at p. 338, fn. 17 [noting that the ICWA does not place the Indian custodian's rights above those of the parents].) Instead, "[t]he transfer of an Indian minor's care and custody to an Indian custodian is, by definition, 'temporary,' and thus revocable." (*G.L.*, *supra*, 177 Cal.App.4th at p. 695.) Moreover, since the establishment and maintenance of an Indian

---

[11] These unequivocal statements of mother's intent, though hearsay, were included in the social worker's interim review report for the February 19, 2013, hearing and were therefore properly before the juvenile court. (*In re Malinda S.* (1990) 51 Cal.3d 368, 376-377, superceded by statute on another ground as stated in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1240-1242; see also *In re M.B.* (2011) 201 Cal.App.4th 1057, 1061; rules 5.690(b) & 5.708(c)(3).) Indeed, they were corroborated by mother's own counsel, who stated at the February 19 hearing: "I spoke with my client on the 15th just last week, and she indicated to me that she no longer supports placement with her brother and she wants to see the children remain where they are. So I am withdrawing my request for placement with the uncle at this time." In determining the legal significance of these statements under the ICWA, we are not, as Rafael suggests, engaged in impermissible appellate fact-finding. Rather, we are drawing a legal conclusion from substantial evidence already before us in the record on appeal.

custodianship is within the exclusive power of a parent and a parent may create such a custodianship on an informal basis, we see no reason why a parent may not also extinguish that status informally, without recourse to the courts or other recognized legal process.  (25 U.S.C. § 1903(6); see *G.L.*, *supra*, 177 Cal.App.4th at p. 695.)

Further, both courts in California and Alaska have recognized a parent's authority to revoke an Indian custodianship despite the fact that a child welfare agency has intervened and taken over custody and control of the minors subject to that custodianship. As the Fourth District opined in *G.L.*:  "At the time [mother] revoked [grandmother's] Indian custodian status, [mother's] parental rights remained intact and [mother] retained legal custody of G.L., even though she did not have physical custody of her.  Thus, [mother] could properly revoke the transfer of G.L.'s care and custody to [grandmother]." (*G.L.*, *supra*, 177 Cal.App.4th at p. 695; see also *Molly O.*, *supra*, 320 P.3d at pp. 305-309 [parents' objection to placing minor children with Indian custodian during child welfare proceedings operates to revoke Indian custodianship].)

We find unavailing Rafael's attempts to distinguish this persuasive precedent because the revocations in the cited cases occurred prior to disposition.  Although the juvenile court may remove a dependent minor from the *physical* custody of the parents at disposition pursuant to subdivision (c) of section 361, such parents retain many residual legal rights with respect to that child until those rights are formally terminated or otherwise curtailed.  (§ 361, subds. (a) & (c); cf. *Ted W.*, *supra*, 204 P.3d at p. 338 ["[a]s long as their parental rights have not been terminated, parents retain legal custody of their children, affording them 'the responsibility for making major decisions affecting the child's welfare' "].)  In fact, pursuant to subdivision (a) of section 361, while the juvenile court may limit the control exercised by a parent over a dependent child at and after disposition, any such order must "clearly and specifically set forth all those limitations." For instance, any limitations on the right of a parent to make educational decisions for a dependent minor must be "specifically addressed" in a court order.  (*Ibid.*)  And, such "limitations may not exceed those necessary to protect the child."  (*Ibid.*)  Thus, while the juvenile court may have had the power to limit mother's right to revoke Rafael's Indian

custodianship, it did not do so in this case. (*In re J.S.* (2011) 199 Cal.App.4th 1291, 1295 ["[t]he mere existence of authority to direct a parent's conduct in relation to his or her child does not in and of itself constitute *exercise* of that authority, and does not translate to automatic limitations on the parent's general rights absent some specific direction or order"].) Thus, mother retained the authority to revoke Rafael's special status under the ICWA despite the pendency of these proceedings.[12]

In contrast, when, in the present case, mother indicated through counsel on February 26, 2013, that she wanted the Designation to remain in place, she was at that point without authority to reinstate the custodial relationship that she had revoked by her actions over the previous month. This is because, at both the detention hearing on October 12, 2012, and the dispositional hearing on January 8, 2013, the Agency was given the responsibility for placement and care of the minors by the juvenile court. The dispositional orders also formally placed the minors in the care, custody, and control of the Agency. Thus, mother no longer had the ability to informally transfer "temporary physical care, custody and control" of the minors to any third party. (See 25 U.S.C. § 1903(6); see *Molly O.*, *supra*, 320 P.3d at p. 309 [parent "may not create or recreate an Indian custodianship" for an Indian child in the custody of a child welfare agency].) Instead, the task of determining placement in accordance with the placement preferences of the ICWA and California's dependency statutes fell on the shoulders of the Agency. (See 25 U.S.C. § 1915(b); §§ 361.31.) We thus agree wholeheartedly with Rafael's contention that, once the Agency intervened, mother no longer had the legal authority to direct who had physical care, custody, and control of her children. However, having successfully granted Rafael special status as the minors' Indian custodian under the ICWA prior to the removal of the minors by the Agency, we conclude that mother retained the power to extinguish that status.

---

[12] Given the facts of this case, we need not reach the issue of whether mother could have revoked Rafael's Indian custodianship over the Agency's, or the juvenile court's, objection. (Cf. *Ted W.*, *supra*, 204 P.3d at pp. 336, 338-339 & fn. 21.)

Under these circumstances, we conclude that Rafael was the designated Indian custodian with respect to the minors only from October 4, 2012, through January 16, 2013. Indeed, an argument could be made that Rafael's Indian custodian status was even more limited. Although mother signed the Designation on October 4, 2012, the record is not clear that she actually transferred physical custody of the minors to Rafael at that time. According to the Agency, the minors were removed from the home of the maternal grandmother, where mother was living. Further, the record does not reflect which adult had actual physical custody of E.R. when mother and Rafael met with the social worker at the Agency on the date of removal, and mother stated at that time that she was the one who cared for the children. Thus, despite the execution of the Designation, mother may never have transferred temporary physical custody to Rafael in accordance with its terms. (Cf. *G.L.*, *supra*, 177 Cal.App.4th at p. 693 [parties do not dispute that G.L. was in the "exclusive custody" of the Indian custodian at the time she was taken into protective custody].)

In addition, since an Indian custodian "stands in the shoes of the parent" (*G.L.*, *supra*, 177 Cal.App.4th at p. 692), it is not certain whether or to what extent both a parent and an Indian custodian can be actively involved in a child welfare proceeding at the same time (cf. *Ted W.*, *supra*, 204 P.3d at p. 339, fn. 23 [identifying but not deciding the issue]). Thus, mother's actions in taking a dominant role in these proceedings and accepting reunification services—presumably with the intent to herself reunify with the minors—may also have been sufficient to revoke Rafael's designation as the minors' Indian custodian. On the other hand, we note that the interpretation of the circumstances in this case that is most favorable to Rafael and the possible preservation of the Indian family is that the minors' Indian family included both mother *and* Rafael. Ultimately, we need not decide this issue, but will presume that mother and Rafael could simultaneously possess some form of custodial rights to the minors, at least until mother clearly revoked those rights with respect to Rafael on January 16, 2013.

**B.**     *Notice Issues*

With these conclusions in mind, we consider first Rafael's claim that this matter must be reversed and remanded for reconsideration of the juvenile court's September 4, 2013, placement decision because the Agency failed to give him the formal notice of these proceedings that was his due as the minors' Indian custodian. As mentioned previously, the ICWA's notice requirement provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or *Indian custodian* and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or *Indian custodian* and the tribe . . . ." (25 U.S.C. § 1912(a), italics added; see also § 224.2, subd. (a); Guidelines, 80 Fed. Reg. at pp. 10153-10154.)

While the express language of the ICWA quoted above mandates notice to the parent *or* Indian custodian, both the federal Guidelines and California law provide for notice to the parent *and* the Indian custodian. (§ 224.2, subd. (a); see Guidelines, 80 Fed. Reg. at pp. 10153-10154.) Clearly, in this case, Rafael had actual notice of the proceedings, being present at the removal of the minors and at many of the early hearings in this matter. However, it is undisputed that the Agency failed to provide the statutorily required ICWA notice to him as the minors' Indian custodian and that, as a result, he did not receive a court-appointed attorney or participate as a party in the proceedings until February 2013.

A notice violation under the ICWA, however, "is not jurisdictional in the fundamental sense, but instead is subject to a harmless error analysis." (*G.L.*, *supra*, 177 Cal.App.4th at pp. 695-696 [listing cases].) Thus, in order to obtain a reversal for lack of proper ICWA notice, an appellant "must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error." (*Id.* at p. 696.) Here, Rafael was entitled to the statutory ICWA notice from the minor's removal in

26

October 2012 until his Indian custodianship was revoked by mother on January 16, 2013. (See *G.L.*, *supra*, 177 Cal.App.4th at p. 695 [notice provisions of the ICWA no longer apply to the Indian custodian once the custodianship was revoked].) Under the unique facts of this case, we conclude that the Agency's failure to provide the mandated notice to Rafael during this time period was harmless.

Specifically, during the timeframe at issue—October 9, 2012, through January 16, 2013—the juvenile court held three hearings in this matter: the October 12, 2012, detention hearing, the November 14, 2012, jurisdictional hearing, and mother's January 8, 2013, dispositional hearing. Even if Rafael had received ICWA notice, intervened, and had counsel appointed prior to the detention hearing, we see no probability, let alone a reasonable one, that the minors would have remained placed with him. The minors were removed from the property where both mother and Rafael lived after suffering significant neglect. The Cloverdale Rancheria was, from the start, opposed to placement with Rafael. And it was apparent to the Agency that Rafael suffered from some kind of cognitive deficit that required assessment. Under such circumstances, the evidence supporting temporary detention of the minors was overwhelming.

Similarly, significant and uncontested evidence supported the juvenile court's jurisdictional finding that mother's substance abuse placed the minors at substantial risk of harm. Indeed, mother admitted that she had been using methamphetamine since she was 12 years old and indicated at the November 2012 jurisdictional hearing that she wanted to enter drug treatment and "get her life back on track." Since dependency jurisdiction is taken over children rather than parents, the allegations regarding mother's substance abuse and neglect of the minors were sufficient to support jurisdiction in this case. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) In particular, it was unnecessary that any additional allegations regarding Rafael be expressly asserted or proved. (See *In re Briana V.* (2015) 236 Cal.App.4th 297. 311.) Given these facts, we find no reasonable probability that Rafael's

intervention and participation through counsel at the jurisdictional hearing would have changed its outcome.

In truth, the real crux of Rafael's complaint in this matter has always been his desire to regain custody of the minors, with adequate tribal and Agency services in place to support that placement. Although Rafael did not participate as a party in the portion of the dispositional hearing which impacted mother's custodial status and reunification services, the question of his custodial rights and entitlement to services was, as we discuss further below, exhaustively considered at the September 2013 placement hearing in this matter, where Rafael was an active participant represented by counsel. Thus, again, we find any failure to provide early ICWA notice in these proceedings harmless.

In reaching this conclusion, we are influenced by two additional factors. First, this is not a case where the juvenile court ignored the minors' Indian heritage or deprived the Cloverdale Rancheria of the right to participate in the proceedings. In fact, other than failing to recognize Rafael's Indian custodian status in the early stages of the case, the proceedings were conducted in accordance with the ICWA, the court properly applied the ICWA's substantive provisions, and placement of the minors with Rafael was denied in accordance with the request of the Cloverdale Rancheria. (Cf. *G.L.*, *supra*, 177 Cal.App.4th at p. 696.) In addition, we cannot ignore the current procedural posture of this case, in which Rafael's Indian custodianship rights have long been extinguished. Under such circumstances, "even a conditional reversal and remand for further ICWA notice would be futile, 'an empty formality and a waste of ever-more-scarce judicial resources.' " (Cf. *ibid.*)

## C.    *Other Compliance Issues Under the ICWA*

Rafael also argues that the juvenile court's September 2013 placement decision must be reversed because the Agency failed to make active efforts to prevent the breakup of the Indian family as required by the ICWA. (25 U.S.C. § 1912(d).) Although the juvenile court did make an active efforts finding at mother's dispositional hearing in January 2013—which it referenced at the September hearing—Rafael argues that active efforts specific to him as the minors' Indian custodian were required before the Agency

28

could lawfully remove the minors from his custody. In addition, Rafael faults the juvenile court for failing to make an appropriate detriment finding under the ICWA before formally removing the minors from his custody at the conclusion of the placement hearing. As stated above, before a minor subject to the ICWA can be placed in foster care, the court must make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(e).) Although the juvenile court did make a detriment finding at the September 2013 hearing, Rafael argues that the standard used by the court differed from that required by the ICWA and was improper.

Indubitably, had Rafael remained the minors' designated Indian custodian, the September 2013 placement hearing would have essentially acted as a dispositional hearing with respect to Rafael, where both an active efforts and a detriment finding would have been required under California and federal law. (25 U.S.C. § 1912(d) & (e); §§ 224.6, § 361, subds. (c)(6) & (d), 361.7, subds. (a) & (c); rule 5.484(a) & (c).) However, since we have concluded that Rafael's status as the minors' Indian custodian was revoked months earlier, in January 2013, no such findings were necessary at the placement hearing. We therefore need not determine whether the findings actually made by the juvenile court would otherwise have been sufficient under the ICWA.

Instead, as it turns out, what Rafael was really seeking at the September 2013 hearing was a preferred placement as an extended family member under the ICWA. "ICWA provides placement preferences and standards to be followed in foster care placements of Indian children." (*G.L.*, *supra*, 177 Cal.App.4th at p. 697.) As is relevant here, "absen[t] good cause to the contrary," preference for the placement of an Indian child pursuant to the ICWA must first be given to "a member of the Indian child's extended family" such as Rafael. (See 25 U.S.C. § 1915(b).) The Guidelines provide a number of factors to be considered in deciding whether good cause exists to diverge from the ICWA's statutory placement preferences, including: (1) the request of the biological parents; (2) the request of the child; and (3) the extraordinary physical and emotional

29

needs of the child as established by the testimony of a qualified expert witness. (Guidelines, 80 Fed. Reg. at p. 10158.) We review a juvenile court's decision to deviate from the ICWA's placement preferences for substantial evidence. (*G.L.*, *supra*, 177 Cal.App.4th at p. 697.)

In the present case, as our detailed review of the record makes clear, the evidence was compelling that good cause existed to forgo placement of these special needs children with Rafael.[13] First, the Cloverdale Rancheria, mother, the Agency, and the attorney for the minors—essentially everyone other than Rafael, himself—was opposed to Rafael obtaining custody of the children. In addition, the detailed report prepared by Dr. Singer, along with her testimony at the hearing, provided strong evidence that Rafael could not effectively parent these minors due to his significant cognitive deficits. The record also extensively chronicled the numerous and varied developmental and psychological issues faced by the children as a result of the neglect they suffered prior to their removal by the Agency. Both the juvenile court and Dr. Singer recognized that the minors would need strong and structured parenting in order to have the best chance at overcoming these early deficits, parenting that Rafael was unable to provide. Moreover, although Rafael provided evidence of his past involvement in the minors' upbringing and argued that he had proved his ability to care for them "by the fact that I cared for them very well in the past[,]" the juvenile court concluded just the opposite, stating: "In a way, I think it's one of those proof-is-in-the-pudding things. The four children are doing very badly. To the extent that [Rafael] has been involved in their nurturing, it hasn't worked." Although we have no doubt that Rafael loves the children and is devoted to them, we find this determination, and the juvenile court's resulting placement decision, manifestly supported by the evidence.

---

[13] Although the juvenile court did not make a good cause finding in this case, reversal is not required where, as here, the correct findings were amply supported by the evidence. (*In re A.J.* (2013) 214 Cal.App.4th 525, 538; *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1450; see *People v. Geier* (2007) 41 Cal.4th 555, 582 [appellate court reviews the correctness of the court's ruling, not its reasoning, "and, if the ruling was correct on any ground, we affirm"].)

In sum, Rafael has identified no error requiring reversal of the juvenile court's September 2013 decision denying him placement of the minors.[14]

## D. *Permanent Plan Issues*

In his two later appeals, Rafael disputes the propriety of the juvenile court's April 2014 and October 2014 permanent plan orders maintaining the minors in long-term foster care and regulating visitation between Rafael and the children. Specifically, he first contends that, if this court reverses the juvenile court's September 2013 placement decision due to the ICWA violations identified in his earlier appeal, we must also reverse the later permanent plan and visitation orders made with respect to the minors. He also argues that the permanent placement of the four minors in long-term foster care is not "necessary and appropriate" because he stands ready, willing, and able to take custody of all four children with the assistance mandated by the ICWA.

Given the conclusions reached in this opinion, Rafael's first argument necessarily fails. With respect to the appropriateness of the minors' permanent plans, we note that Rafael did not raise this issue in the juvenile court, and we may therefore deem it forfeited. (See *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [listing cases]; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) More fundamentally, however, "[o]nce an Indian custodian's status has been revoked, that person has no role in ongoing child protection proceedings." (*Molly O.*, *supra*, 320 P.3d at p. 309; see *G.L.*, *supra*, 177 Cal.App.4th at p. 695 [holding that the notice provisions of the ICWA no longer applied to the Indian custodian once the custodianship was revoked].) Of course, Rafael can continue to appear in the juvenile court and request visitation with the minors as an interested relative. And, indeed, the juvenile court seems very aware that Rafael is important to these minors and should remain in their lives in some capacity. Rafael,

---

[14] When counsel was appointed for Rafael on February 26, 2013, he was no longer the minors' Indian custodian as that status had been revoked by mother the previous month. Since we do not reject the issues raised by Rafael in his first appeal based on any possible substandard conduct by his trial attorney, we need not further consider his claim of ineffective assistance of counsel.

however, is no longer a party to these proceedings and therefore cannot contest the selection and maintenance of the minors' permanent plans.

## III.  DISPOSITION

The juvenile court's September 4, 2013, order denying placement of the minors with Rafael is affirmed.  So too are the court's April 2014 and October 2014 permanent plan orders.

_____

REARDON, J.


We concur:


_____

RUVOLO, P. J.


_____

STREETER, J.


*In re E.R.* A139939

Trial Court:                     Mendocino County Superior Court

Trial Judge:                  Hon. David Nelson

Counsel for Appellant:       Gorman Law Office
Seth Gorman

First District Appellate Project

Counsel for Respondent:     Office of the County Counsel
County of Mendocino
Douglas L. Losak
Rachel M. Davis

*In re E.R.*  A139939, A142253, A143702